Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/18/2025 09:09 AM CDT

Stacy L. Jones, appellee, and
State of Nebraska, intervenor-appellee,
v. Joshua Colgrove, appellant.

___ N.W.3d ___

Filed July 18, 2025.    No. S-24-018.

1. **Modification of Decree: Child Custody: Visitation: Child Support: Appeal and Error.** Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion.

2. **Judgments: Child Support: Alimony: Taxation: Appeal and Error.** An appellate court reviews a trial court's determinations on matters such as child support, alimony, and the child dependency exemption de novo on the record to determine whether the trial judge abused his or her discretion.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

4. **Parent and Child: Proof.** To meet the requirement for "special written findings" under Neb. Rev. Stat. § 43-2932(3) (Reissue 2016), the court must, at a minimum, specifically state that it finds that the children and the other parent may be adequately protected from harm by the limits the court has actually imposed in the parenting plan. The court's findings should also indicate that the court recognized that the burden on this issue was on the parent found to have committed the abuse. The court should further identify what limits it imposed in the parenting plan that it finds will provide the necessary protection.

5. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

6. **Statutes.** Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

7. **Statutes: Appeal and Error.** An appellate court will not resort to interpretation of statutory language to ascertain the meaning of words which are plain, direct, and unambiguous.

8. **Statutes.** It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.

9. **Moot Question: Words and Phrases.** A case is moot if the facts underlying the dispute have changed, such that the issues presented are no longer alive.

10. **Moot Question.** The central question in a mootness analysis is whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.

11. **Moot Question: Appeal and Error.** The public interest exception to the mootness doctrine requires an appellate court to consider (1) the public or private nature of the question presented, (2) the desirability of an authoritative adjudication for guidance of public officials, and (3) the likelihood of recurrence of the same or a similar problem.

12. **Child Custody.** When both parents are found to be fit, the inquiry for the court is the best interests of the children.

13. **Child Support: Taxation.** A tax dependency exemption is nearly identical in nature to an award of child support or alimony.

14. **Child Support: Taxation: Presumptions.** In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child.

15. **Child Support: Taxation: Waiver.** A court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires.

16. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Eddy M. Rodell for appellee.

Natalie T. Lips, Deputy Lancaster County Attorney, for intervenor-appellee.

FUNKE, C.J., MILLER-LERMAN, CASSEL, STACY, PAPIK, and FREUDENBERG, JJ.

FUNKE, C.J.

## I. INTRODUCTION

Joshua Colgrove (Joshua) appeals the district court's decision to grant legal and physical custody of B.C. to B.C.'s mother, Stacy L. Jones (Stacy). Joshua contends that the district court erred in its procedural, legal, and factual conclusions. Because we find that such conclusions were not an abuse of discretion, we affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Joshua and Stacy were in a relationship for several years. For most of their relationship, the couple and Stacy's three children lived together in Joshua's house in Superior, Nebraska. During their relationship, the couple had one child together, B.C., whose custody is the subject of this dispute.

In early 2019, Joshua became ill and was eventually diagnosed with Guillain-Barre syndrome. As a result, he spent several months in hospitals and rehabilitative facilities and did not return home until September 2019.

During Joshua's illness, Stacy filed Joshua's state and federal income tax returns. Stacy deposited his state income tax refund into Joshua's account but deposited the federal income tax refund of approximately $7,000 into her account to pay "bills" because Joshua was in the hospital and unable to work. Stacy testified that Joshua gave her permission to do this. Joshua claims he was on pain medications and was unconscious most of the time during his illness and, therefore, could not and did not give Stacy permission to file his tax returns or to utilize the subsequent refund.

During this same period, Stacy also established a "GoFundMe" account. The money raised from the account was ultimately used for "fuel and food." The parties dispute whether

the money was supposed to be used to pay for Joshua's medical expenses.

It was because of this disagreement, in part, that the couple terminated their relationship. After the separation, Stacy and her children, including B.C., moved to Lincoln, Nebraska. There were no formal agreements in place regarding custody of B.C. at the time of the move.

### (a) Procedural History in Juvenile Court and Supreme Court

In 2019, after the termination of her relationship with Joshua, Stacy was charged with felony child abuse after an incident in which she threatened her oldest son with a knife. She was convicted in 2020 and received a sentence of probation. As a result, juvenile court proceedings were commenced for all of Stacy's children, and B.C. was placed in foster care. After becoming aware of this situation, Joshua filed a petition to intervene in the juvenile court matter, requesting that B.C. be placed with him.

Based on his request, the Nebraska Department of Health and Human Services (DHHS) asked that Joshua fulfill various tasks intended to evaluate his fitness as a placement for B.C. Joshua initially complied with DHHS' requests for a home inspection. Joshua did not, however, accommodate further DHHS requests for permission to conduct background checks on his family members or for signed releases to access his medical documentation. Joshua declined to participate because he "felt like [the DHHS] requests [were going to] be never ending."

As a result, Joshua's request for placement was denied, and he appealed, eventually leading to three opinions of this court.[1] The full factual and procedural history of the litigation can be found in those cases, and we do not detail it again here.

---

[1] See, *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020), *supplemented by* 308 Neb. 749, 957 N.W.2d 138 (2021); *In re Interest of A.A. et al.*, 310 Neb. 679, 968 N.W.2d 607 (2022).

(b) Procedural History in District Court

Following our three opinions, the juvenile court ultimately found that Stacy had been rehabilitated and was a fit parent. It awarded physical and legal custody of B.C. to Stacy, with Joshua receiving parenting time every other weekend. Under Neb. Rev. Stat. § 43-246.02 (Cum. Supp. 2024), the juvenile court subsequently entered a bridge order on May 11, 2022, reflecting that decision and transferring its jurisdiction to the district court. On the same day, the district court entered a "Custody Decree" consistent with the juvenile court's order.

On May 18, 2022, Joshua filed a petition for modification of the bridge order, seeking custody of B.C. Roughly 7 hours later, however, the juvenile court entered an "Amended Bridge Order." Fixing only minor technical errors, the amended bridge order was identical in substance to the first order. The amended bridge order was followed by the district court's "Amended Custody Decree," which was also identical to the previous custody order. Stacy filed an answer to Joshua's initial petition for modification.

A few months later, in the same district court case, the State filed a "Complaint to Modify to Establish Child and Medical Support." The State sought to have Joshua pay child support for B.C. and to have Stacy provide insurance for B.C., so long as it was "reasonably available" to her. Joshua moved to dismiss and strike the State's pleading, reasoning that under § 43-246.02 and Neb. Rev. Stat. § 43-512.08 (Reissue 2016), the State was pursuing the matter in a procedurally improper manner. The district court overruled the motion.

In March 2023, the district court entered a "Pretrial Order," stating that the only pending pleading seeking modification of the bridge order was the State's, since Joshua's complaint to modify had been filed before the amended custody decree. In that order, the district court provided Joshua an opportunity to file a responsive pleading, including a counterclaim. Joshua filed motions to reconsider and to strike the amended bridge order and the amended custody order, which were overruled

without explanation. His subsequently filed answer to the State's complaint contained a counterclaim for a modification of the bridge order.

## 2. EVIDENCE AT TRIAL

Trial was held in September 2023. The evidence adduced at trial, and not otherwise addressed above, is summarized below as it pertains to the primary arguments raised by the parties. Additional factual information beyond that detailed below is presented later in the opinion as necessary to resolve the parties' arguments on appeal.

### (a) Stacy's Actions After Conviction

As mentioned above, Stacy's child abuse conviction led to a sentence of probation. Stacy testified that her probation guidelines included requirements that she "complete any alcohol, drug, and/or mental health evaluation[s], counseling, or treatment as directed"; attend no less than two "pro-social activities per week . . . such as Alcoholics Anonymous, church, etc."; and attend and successfully complete parenting education classes. Stacy testified that she fulfilled these requirements. More specifically, Stacy testified that she completed a psychological evaluation, a parenting class, and a "DMT" course. Stacy also testified that, without prompting, she took a domestic violence course and participated in individual and family therapy. She further utilized "Intensive Family Reunification" services.

### (b) B.C.'s School Behavior

Evidence at trial showed that B.C., who was in fourth grade at the time, was subject to an individualized education plan to manage his "[e]motional [d]isturbance." As a result of such "emotional disturbance," B.C. had been disruptive in the classroom, and the school had issued 21 "seclusion and restraint" letters for B.C. B.C. attends individual therapy to assist with these behavioral problems and, at the time of trial, was scheduled to undergo a psychological evaluation. Stacy testified that staff at the school told her that there might be a correlation between B.C.'s behavior and his visits with Joshua.

Stacy also testified that she receives daily updates on B.C.'s behavior and that she frequently communicates with B.C.'s teachers regarding the same. Stacy uses this information to reward or discipline B.C. at home. Stacy testified that the parenting class she took taught her that children need "routine[s]," so, with B.C., she enforces a chore schedule, a set bedtime, limited "electronic[s] time," and expectations regarding homework.

Joshua also testified that he has "at least weekly," but sometimes daily communication with B.C.'s teachers. He similarly testified to rules and expectations relating to B.C.'s bedtime, completing chores, "screen time," and not talking back when asked to do a task. Joshua also explained that of the 21 seclusion and restraint orders issued by the school, only about half were immediately before or after visits with Joshua, so he disputed the correlation drawn by the school.

### (c) Communication Between
### Stacy and Joshua

Both parties testified to communication difficulties between them, including a lack of direct communication and difficulty coordinating video calls.

Testimony and exhibits showed there were instances when Joshua did not respond to Stacy's communications regarding B.C. For example, in two emails admitted into evidence, Stacy suggested to Joshua, first, that they consider family therapy, and, second, that they use "talkingpoints.com" to house all their communications, since Stacy planned to discontinue email as a mode of communication. Neither email contained a reply from Joshua, and he testified that he "supposed [he] could have not responded." Likewise, there was no response to a letter from Stacy to Joshua detailing the dates and times for B.C.'s upcoming appointments and parenting times.

Both parties also testified to times when video call communications between B.C. and Joshua ceased. In 2022, the parties participated in mediation, eventually reaching an agreement

regarding various matters, including video calls. After mediation, however, Joshua refused to sign the mediation agreement, alleging that it did not reflect what he had agreed to. Following this refusal, there was a period of several months during which B.C. and Joshua did not have video calls because, according to Stacy, she was waiting for Joshua to reach out to her to explain what sort of arrangement he would agree to.

### (d) Parties' Home Lives

Because of Joshua's medical diagnosis, he does not work and, instead, receives Social Security disability benefits. Joshua testified that he has, however, recovered enough to drive and care for himself and B.C. Joshua owns a four-bedroom home, which allows B.C. to have his own room. Additionally, B.C. has a half brother, a grandmother, and other relatives whom he sees when he is with Joshua.

Stacy works overnight at a hotel, but her boyfriend stays at her house while she is at work so that the children are not alone. Stacy currently resides in a two-bedroom duplex where B.C. shares one of the rooms with his two older, teenaged siblings, one of whom is a girl. However, Stacy testified that the children respect each other's privacy and that her daughter locks the door while dressing. Stacy admitted that she has been twice evicted from a residence, but that she is currently "working with a realtor" to purchase her own home.

Stacy also testified that, despite repair attempts, damage from a 2019 vehicle accident causes her vehicle to shut down after 40 minutes, leaving her with unreliable transportation.

### 3. District Court's Order

After trial, the district court issued an order for modification that adjusted certain provisions of the amended bridge order but left the overall custody determination in place. Accordingly, the accompanying parenting plan granted Stacy full custody of B.C., with Joshua maintaining parenting time every other weekend from Friday at 5 p.m. to Sunday at 5 p.m. It also established summer and holiday parenting time.

The court ordered Joshua to pay child support in the amount of $315 per month and ordered Stacy to maintain health insurance for B.C., so long as it was reasonably available to her.

Of particular relevance to this appeal, the district court also made the following factual findings: (1) "[Joshua] declined to sign a medical release, submit himself and other family members to a background check, or submit to a home visit/inspection. As a result, [B.C.] was never placed in his care by the juvenile court and/or DHHS"; (2) "[Joshua] takes little or no initiative when it comes to [B.C.]"; (3) "[Stacy] tries to communicate with [Joshua] about matters pertaining to [B.C.] [Joshua] does not respond"; (4) "[Stacy] complied with the requirements and recommendations of the juvenile court and/or DHHS. She has taken the appropriate steps to address her anger and that which led to the event in . . . 2019"; and (5) "[Stacy] is taking appropriate steps to assist [B.C.] and his progress in school."

Joshua appealed, and we granted his petition to bypass the Nebraska Court of Appeals.[2]

### III. ASSIGNMENTS OF ERROR

Joshua assigns, consolidated and restated, that the district court erred in (1) failing to comply with Neb. Rev. Stat. § 43-2932 (Reissue 2016); (2) denying Joshua's motion to dismiss and strike the State's complaint and subsequently ordering child support; (3) denying Joshua's motions to strike the amended bridge order and the amended custody decree; (4) declining to award legal and physical custody of B.C. to Joshua and, in doing so, reaching various factual conclusions about Stacy and Joshua; (5) requiring Joshua to be solely responsible for B.C.'s transportation to and from parenting time with Joshua; (6) not awarding Joshua any entitlement to the child tax credit for B.C.

---

[2] See Neb. Rev. Stat. § 24-1106(2) (Cum. Supp. 2024).

## IV. STANDARD OF REVIEW

[1] Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion.[3]

[2] An appellate court reviews a trial court's determinations on matters such as child support, alimony, and the child dependency exemption de novo on the record to determine whether the trial judge abused his or her discretion.[4]

[3] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[5]

## V. ANALYSIS

### 1. District Court Order
#### Satisfied § 43-2932

We first address Joshua's argument that the district court failed to comply with § 43-2932. Joshua argues that because Stacy was convicted of child abuse, and because evidence of that conviction was admitted at trial, the district court was required to make § 43-2932 findings but that its order fell short of the statutory requirements.

Specifically, the district court's order for modification stated, "[Stacy] can adequately protect [B.C.] and provide for his safety in her home. The 'MODIFIED PARENTING PLAN "EXHIBIT A"' is in [B.C.'s] best interest and will not endanger him, [Stacy], or [Joshua]." In so holding, the court cited § 43-2932.

Section 43-2932 generally provides that if a parent is found to have committed a specific act, child abuse being the act relevant here, limits shall be imposed that are reasonably

---

[3] *Lizeth E. v. Roberto E.*, 317 Neb. 971, 12 N.W.3d 809 (2024).

[4] *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

[5] *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024).

calculated to protect the child or child's parent from harm. Section 43-2932 further states:

> (3) If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

[4] To meet the requirement for "special written findings" under § 43-2932(3), the court must, at a minimum, specifically state that it finds that the children and the other parent may be adequately protected from harm by the limits the court has actually imposed in the parenting plan.[6] The court's findings should also indicate that the court recognized that the burden on this issue was on the parent found to have committed the abuse.[7] The court should further identify what limits it imposed in the parenting plan that it finds will provide the necessary protection.[8]

Joshua contends that the district court's order failed to explain that Stacy had the burden of proving that her exercise of parenting time would not endanger B.C. He also contends that the district court failed to detail what limitations it was placing on Stacy's parenting time to protect B.C.

We disagree with Joshua's contention that the district court's findings were insufficiently specific. The district court found that Stacy was convicted of child abuse, but it also found that B.C. and both of his parents would be protected under the

---

[6] *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W.2d 882 (2022).

[7] *Id*.

[8] *Id.*

parenting plan curated by the court. Although not explicitly stated, the district court's language, namely its findings that Stacy's testimony was credible and that she would be able to adequately protect B.C. from any harm, indicates the court's understanding of Stacy's burden in this case. As to specific limits to help ensure B.C.'s protection, the court pointed to the fact that Stacy had fully complied with all the requirements and recommendations of her probation and that she had taken steps to "develop appropriate coping skills and improve her parenting skills." The court declared that Stacy had "done all that was asked of her and more." This is sufficient to comply with § 43-2932.

## 2. DISTRICT COURT DID NOT ERR IN DENYING JOSHUA'S MOTION TO DISMISS AND STRIKE STATE'S COMPLAINT AND TO AWARD CHILD SUPPORT

Second, Joshua assigns that the district court erred in denying his motion to dismiss and strike the State's complaint and in subsequently granting the State's request to impose child support obligations on Joshua. Joshua argued, both below and on appeal, that the State's intervention was impermissible under §§ 43-512.08 and 43-246.02(4) and (9).

Section 43-512.08 provides that "the State . . . may intervene without leave of the court in any proceeding for dissolution of marriage, paternity, separate maintenance, or child, spousal, or medical support for the purpose of securing an order for child, spousal, or medical support."

Section 43-246.02(4), however, states, in part, that "[a] bridge order shall only address matters of legal and physical custody and parenting time. All other matters, including child support, shall be resolved by filing a separate petition or motion or by action of the child support enforcement office and shall be subject to existing applicable statutory provisions."

Further, § 43-246.02(9) provides for the modification of a bridge order, noting, in relevant part, that "[f]ollowing the issuance of a bridge order, a party may file a petition in

district court for modification of the bridge order as to legal and physical custody or parenting time."

Based on these provisions, Joshua asserts that under § 43-246.02(9), the instant proceeding is one for the modification of a bridge order, and that under § 43-512.08, the State is not permitted to intervene in such proceedings. It is Joshua's contention that it is not possible for this case to be a paternity action because under § 43-246.02(4), a bridge order cannot address any issues beyond those for "legal and physical custody and parenting time." Instead, Joshua asserts that the only permissible way for the State to bring an action for child and medical support when a bridge order is in place is to commence an entirely separate action.

The State, however, counters that Joshua's reading of § 43-246.02(4) is contrary to the plain language of the provision, which simply requires the filing of a "separate petition or motion," as opposed to an entirely separate action. It also notes that reading the statute to require the filing of a separate action would be antithetical to principles of judicial economy.

The State further contends that the fact that this action is a proceeding for the modification of a bridge order does not prevent it from also being a paternity action. In support of this contention, the State points out that during the proceedings of *In re Interest of A.A. et al.*,[9] one of our previous opinions in this same litigation, the juvenile court received an "acknowledgment of paternity" that had been notarized, signed by both parties, and appropriately filed with DHHS. The State notes that it was because of the introduction of this acknowledgment that the juvenile court's amended bridge order made the finding that "paternity for [B.C.] was addressed via acknowledg[ment] of paternity" and that the district court similarly stated, "Joshua [is] the parent[] of [B.C.]" The State argues that these were determinations of paternity and that

---

[9] *In re Interest of A.A. et al., supra* note 1, 307 Neb. at 828, 951 N.W.2d at 157.

under § 43-512.08, it is permitted to intervene in actions of paternity. We agree with the State. We find that the plain language of § 43-246.02(4) does not require the commencement of separate proceedings to address child support and that this is the type of proceeding in which the State may intervene.

### (a) Separate Proceedings Not Required to Address Child Support Under § 43-246.02(4)

We note that Joshua's arguments in support of this assignment of error are focused exclusively on statutory interpretation, and we have limited our analysis accordingly. In doing so, we find no merit to his arguments because Joshua fails to consider the plain meaning of the statute, generally, and of the word "petition," specifically.

[5-8] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[10] Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.[11] An appellate court will not resort to interpretation of statutory language to ascertain the meaning of words which are plain, direct, and unambiguous.[12] It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.[13]

Joshua's interpretation of the statute is at odds with the plain language of the text. Looking first at subsection (4) within the broader context of § 43-246.02, it is evident that the limitations it imposes are on the breadth of topics a juvenile court can include in its bridge order; the plain language does not purport to place restrictions on the matters the district court will subsequently be permitted to address in its determinations. Section 43-246.02(11) states that nothing in that section

---

[10] *Mullins v. Box Butte County*, 317 Neb. 937, 13 N.W.3d 67 (2024).

[11] *State v. Godek*, 312 Neb. 1004, 981 N.W.2d 810 (2022).

[12] *Id.*

[13] *Id.*

shall be construed to interfere with the jurisdictional provisions of Neb. Rev. Stat. § 25-2740 (Cum. Supp. 2024), which grants district courts jurisdiction for domestic relations matters, including child support or medical support. Accordingly, based on the language of the statute, we see no reason why district court proceedings could not deal with both the modification of a bridge order and other issues, such as child support or medical support.

Although § 43-246.02(4) provides three possible ways of addressing "[a]ll other matters, including child support . . . ," we look only at the plain meaning of the phrase "by filing a separate petition," since that is the statutory option the State purported to follow. According to Black's Law Dictionary, a "petition" is "[a] formal written request presented to a court or other official body."[14] There are multiple ways for parties to make a request of the court, whether that be through existing litigation or through the commencement of new litigation. We see nothing in the plain language of the phrase that purports to specify how or in what manner that request must be made; the Legislature left this language quite broad. Therefore, the most that can be said of the phrase "a separate petition" in § 43-246.02(4) is that some formal written request must be made apart from the bridge order. We decline to impose a narrower meaning.

Here, the State sought a determination of child and medical support through a separate complaint, and we cannot say that this did not comply with § 43-246.02(4).

### (b) This Is Paternity Action in Which State Could Intervene Under § 43-512.08

We also conclude that this case qualifies as a paternity action, and thus, the State is permitted to intervene under § 43-512.08.

A legal commentator explains that, simply put, a paternity action is "a finding by the court that a man is the father of

---

[14] Black's Law Dictionary 1382 (12th ed. 2024).

a child."[15] Joshua does not contest that the juvenile court's amended bridge order and the district court's order of modification made a finding that Joshua is B.C.'s father. Additionally, under § 43-246.02(1)(b), a bridge order can only be entered by the juvenile court once a determination of paternity has been legally established. Therefore, this case is, by definition, a paternity action. Because a paternity action is specifically contemplated under § 43-512.08 as the type of action in which the State can intervene as of right, we hold that the district court did not err in permitting the State to do so.

### 3. Issue of District Court Denying Joshua's Motions to Reconsider and to Strike Is Moot

As discussed above, Joshua filed his petition for modification in the district court between the issuance of the custody decree and the amended custody decree. As a result, the district court required him to refile his petition because it found the amended custody decree, as opposed to the initial custody decree, to be the operative order. On appeal, Joshua argues that the entering of these custody orders was improper and that, accordingly, his motions to reconsider the pretrial order and to strike the amended documents should have been granted.

More specifically, Joshua contends that it was improper for the district court to issue an initial custody decree in the first place because its issuance was neither required nor authorized by § 43-246.02. Joshua further argues that the juvenile court improperly issued the amended bridge order because its jurisdiction terminated when it filed the initial bridge order. Accordingly, it is Joshua's position that the amended custody decree is improper since it was issued in response to the amended bridge order. Joshua claims that the court's mistakes imposed "significant burdens"[16] on him because he had to

---

[15] Christine P. Costantakos, Juvenile Court Law and Practice § 6:6 at 476 (2024).

[16] Brief for appellant at 44.

expend unnecessary resources to prepare and file additional pleadings. He further posits that although the district court's final order for modification may have mooted the matter, this court should still address the issue to ensure that "the will of the Legislature is honored" and that future litigants have "their 'day in court.'"[17]

Stacy argues that the order for modification did, in fact, moot the issue and that it does not meet the requirements necessary to benefit from the public interest exception to the mootness doctrine.

[9-11] A case is moot if the facts underlying the dispute have changed, such that the issues presented are no longer alive.[18] The central question in a mootness analysis is whether changes in circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.[19] There are, however, exceptions to the mootness doctrine that may allow us to reach the merits of an otherwise moot case. Relevant here, the public interest exception to the mootness doctrine requires an appellate court to consider (1) the public or private nature of the question presented, (2) the desirability of an authoritative adjudication for guidance of public officials, and (3) the likelihood of recurrence of the same or a similar problem.[20]

We agree with Stacy that the issue is moot. The order for modification represented the district court's final determination as to issues of custody, parenting time, and child support. Accordingly, its issuance effectively eliminated any authority held by the amended bridge order and the amended custody decree, and, in doing so, it mooted the issue at hand. Joshua would have us address this issue anyway so that in the future,

---

[17] *Id.*

[18] *MIMG LXXIV Colonial v. Ellis*, 316 Neb. 746, 6 N.W.3d 799 (2024).

[19] *Id.*

[20] *Id.*

"those in Joshua's position" are not subjected to the same type of harm.[21] We decline to do so.

Even assuming that this issue was one of public concern that would benefit from an authoritative adjudication, the situation is unlikely to recur. This case presents a specific and unique set of facts. We have previously declined to extend the exception to such cases because the factual uniqueness means the circumstances are unlikely to repeat themselves.[22] Further, neither party directs us to any comparative cases, and it is unlikely another situation will arise in which the courts issue their respective orders, amend the documents, and manage to catch the petitioner's complaint in the middle of that process by a window of 7 hours. Consequently, we decline to apply the public interest exception.

### 4. District Court Did Not Abuse Its Discretion in Awarding Custody to Stacy or in Making Factual Determinations

Next, Joshua takes issue with the above-detailed factual findings of the district court, arguing that they are unsupported by the evidence. As explained below, these claims are without merit.

[12] The juvenile court explicitly found that Stacy was a fit parent, and there is no allegation that Joshua is not a fit parent. Accordingly, when both parents are found to be fit, the inquiry for the court is the best interests of the children.[23] In determining a child's best interests under Neb. Rev. Stat. § 42-364 (Cum. Supp. 2024), courts may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between

---

[21] Brief for appellant at 44.

[22] See *NP Dodge Mgmt. Co. v. Holcomb*, 314 Neb. 748, 993 N.W.2d 105 (2023). See, also, *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004).

[23] *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007).

child and parents; the age, sex, and health of the child and the parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; and many other factors relevant to the general health, welfare, and well-being of the child.[24] As mentioned above, absent an abuse of discretion, the trial court's factual determinations regarding the best interests of the child will normally be affirmed.[25]

### (a) Finding on Joshua's Failure to Comply With DHHS Requests

Joshua claims that the court erred in finding that it was because Joshua "declined to sign a medical release, submit himself and other family members to a background check, or submit to a home visit/inspection" that B.C. was not placed with him. Alternatively, he asserts that, at the very least, no weight should have been given to these facts.

We disagree. Although at trial Joshua testified that he "wasn't really opposed" to the requests made by DHHS, when asked whether there were "to[o] many hoops . . . to jump through that [he was] not willing to do," Joshua answered, "Yes." Further, in our previous opinions in this matter, we noted such things as "Joshua . . . refused to sign a medical release"[26] and "[n]either Joshua nor his attorney . . . responded to [requests from DHHS]."[27] Our opinions also quote the statements of Joshua's attorney asserting that DHHS would not be allowed to "'ply information from [Joshua] regarding his physical or mental condition, beliefs, feelings, attitudes, practices, customs, personal history, associations, affiliations, or relationships, or the conditions of his home'" and that

---

[24] *Id*.

[25] See *Lizeth E., supra* note 3.

[26] *In re Interest of A.A. et al., supra* note 1, 307 Neb. at 827, 951 N.W.2d at 157.

[27] *Id*. at 830, 951 N.W.2d at 158.

"'[t]here's not going to be a "walkthrough" or any other of this stuff.'"[28] In one of our earlier opinions in this matter, we noted that a juvenile court, "in the exercise of its parens patriae responsibilities, may develop a transition plan constituting a reasonable intrusion of limited duration into the non-offending parent's rights to autonomy in the care and custody of the child."[29] In another of our earlier opinions, we noted that it was because of Joshua's lack of cooperation that "the juvenile court found it was not empowered to place custody with Joshua,"[30] and we decline to revisit the issue. Based on this history, the district court did not abuse its discretion in making such a finding.

### (b) Finding That Joshua Takes Little or No Interest in B.C.

Joshua asserts the district court's statement that he takes little or no interest in B.C. is "scandalous"[31] because the evidence shows that Joshua has exercised his parenting time, been active in B.C.'s education, and pursued custody through this litigation. However, Joshua neglects to consider the fact that the record also shows behaviors that could be seen to reflect indifference.

As discussed above, Joshua previously failed to comply with DHHS requests, which effectively precluded DHHS from placing B.C. with him. Joshua also testified that he was not willing to participate in family therapy sessions. When Stacy asked Joshua if they could make a concerted effort to communicate so that B.C. could see positive communication between his parents, Joshua refused, saying he "[didn't] see

---

[28] *In re Interest of A.A. et al., supra* note 1, 310 Neb. at 682, 968 N.W.2d at 610.

[29] *In re Interest of A.A. et al., supra* note 1, 307 Neb. at 850, 951 N.W.2d at 170.

[30] *In re Interest of A.A. et al., supra* note 1, 310 Neb. at 683, 968 N.W.2d at 610.

[31] Brief for appellant at 37.

how [it was] going to change anything." Both parties also testified that there was a span of nearly 6 months during which B.C. did not have video communication with Joshua because Joshua had not signed the mediation agreement and, according to Stacy, he had not contacted her to reach any other resolution. Based on this information, the district court's conclusion is not untenable.

### (c) Finding That Joshua Does
### Not Respond to Stacy

On this point, Joshua asserts there was evidence in the record that he has communicated with Stacy regarding matters pertaining to B.C. and that the court erred in concluding otherwise.

While we agree that there were two exhibits showing communication between Stacy and Joshua, there were also three exhibits showing communications to which Joshua "supposed [he] could have not responded." Stacy also testified that there were times that she did not even have Joshua's phone number because he "would not provide [it]." Accordingly, we cannot find that the district court's conclusion was clearly untenable or lacking evidentiary support.

### (d) Findings Regarding Stacy's Compliance
### With Rehabilitative Measures

Joshua also disputes the district court's finding that Stacy had "complied with the requirements and recommendations of the juvenile court and/or DHHS . . . to address her anger[,] develop appropriate coping skills and improve her parenting skills." Joshua argues that the court erred in making this finding because there were not actually any "requirements and recommendations" imposed on Stacy by the juvenile court or DHHS.

Instead, Joshua claims there were only "conditions" put on B.C.'s return to Stacy's physical custody in 2021. Joshua also argues that although Stacy testified to the completion of several courses, there was no evidence that such courses were

the "appropriate steps" to take and therefore, the court should not have allocated any weight to these facts.

We conclude otherwise. In addition to the 2021 court order imposing "conditions" on B.C.'s return to Stacy's custody, the record in this case also contains documents from the district court proceedings underlying Stacy's child abuse conviction. Included in those documents is the "Order of Probation," which, among other things, includes the requirements detailed earlier in this opinion. The district court refers to those items in the order as "condition[s] of probation."

Further, we have previously held that "'[t]he basic purpose of probation [is] namely to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself [or herself] without institutional confinement under the tutelage of a probation official and under the continuing power of the court . . . .'"[32] Based on this idea, it is only logical that the "condition[s] of probation" were instituted for the purpose of rehabilitating Stacy. Accordingly, Stacy's testimony that she has completed these conditions would indicate that she has taken the "appropriate steps" to be rehabilitated.

### (e) Finding That Stacy Assists B.C. in School

Next, Joshua contends that the court erred in finding that Stacy assists B.C. in school because, he argues, if she did, the school would not have issued 21 seclusion and restraint orders for B.C.

Stacy testified that she "work[s] with the school daily" and "[doesn't] go a single day without getting an update." Stacy explained that she uses the information she gets from the school about B.C.'s behavior to "implement any sort of rewards or disciplinary actions that [she] need[s] to after school." At the time of trial, Stacy testified that B.C. had lost the privilege of having "electronic[s] time" because of his

---

[32] *State v. Gnewuch*, 316 Neb. 47, 74, 3 N.W.3d 295, 316 (2024).

poor behavior during school. Stacy's testimony also detailed her expectations that B.C. bring home and complete all homework. This evidence supports the conclusion that Stacy helps B.C. with school, so the court did not abuse its discretion in making this determination.

### 5. DISTRICT COURT DID NOT ERR IN REQUIRING JOSHUA TO BE ENTIRELY RESPONSIBLE FOR B.C.'S TRANSPORTATION IN ORDER TO EXERCISE HIS PARENTING TIME

As a separate assignment of error, Joshua contends that the court abused its discretion when it required that he be exclusively responsible for picking up and dropping off B.C. in Lincoln for all parenting time. Instead, he says the district court's modified parenting plan should have required the parties to meet halfway in Aurora, Nebraska.

The district court cannot be said to have abused its discretion here because the record before us shows that the arrangement proposed by Joshua would not have been feasible. Stacy testified that she lacks reliable transportation because her vehicle will only run for approximately 40 minutes before shutting down. The drive from Lincoln to Aurora is about an hour each way. Joshua, on the other hand, testified both that he does not work and that he is able to drive.

### 6. NOT ABUSE OF DISCRETION TO NOT AWARD CHILD TAX CREDIT TO JOSHUA

Lastly, Joshua argues that the district court abused its discretion in not awarding the child tax credit for B.C. to Joshua. In support of this argument, he notes his assertion that Stacy fraudulently filed his tax returns and deposited the refund into her own account and wrongly utilized the money from the "GoFundMe" account for her own purposes. Based on this, Joshua asserts that it is "unconscionable" for the district court not to award him the child tax credit at least every other year.[33]

---

[33] Brief for appellant at 47.

[13-15] A tax dependency exemption is nearly identical in nature to an award of child support or alimony.[34] In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child.[35] However, a court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires.[36]

[16] Based on the record before us, we cannot say that the district court abused its discretion in not awarding the child tax credit to Joshua. At trial, the evidence relating to the tax returns and "GoFundMe" account was conflicting. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.[37] The district court heard Joshua's testimony on the matter. The district court also heard Stacy's testimony that her activity was not fraudulent because Joshua had given her permission to file the tax returns and to use both the refund and the GoFundMe account money. Hearing both sides, the district court, impliedly, did not find Joshua's argument to be credible and declined to award Joshua the child tax credit. It is not the role of this court to question the credibility determinations of the district court.

## VI. CONCLUSION

For the reasons set forth above, we find Joshua's arguments to be without merit. Accordingly, we affirm the order of the district court.

Affirmed.

---

[34] *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005).

[35] *Anderson, supra* note 4.

[36] *Id*.

[37] *Mann, supra* note 5.