IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE ON BEHALF OF APOLLO S. v. ADAM S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF APOLLO S., APPELLEE AND CROSS-APPELLANT,

V.

ADAM S., APPELLANT AND CROSS-APPELLEE, AND REBECCA B., APPELLEE.

Filed April 28, 2026.    No. A-25-444.

Appeal from the District Court for Lancaster County: MATTHEW O. MELLOR, Judge. Affirmed in part, and in part reversed.

Sean M. Reagan, of Reagan Law Offices, P.C., L.L.O., for appellant.

Katherine J. Shumpert, Deputy Lancaster County Attorney, for appellee State of Nebraska.

MOORE, PIRTLE, and FREEMAN, Judges.

FREEMAN, Judge.

### INTRODUCTION

Adam S. appeals the order from the Lancaster County District Court granting sole physical custody of his child, Apollo S., to the child's mother, Rebecca B. The State of Nebraska cross-appeals the order modifying child support. For the reasons explained below, we affirm the child custody order and reverse the modification of child support.

### BACKGROUND

Adam and Rebecca are the unmarried biological parents of Apollo, born in October 2020. Adam's paternity was established on October 12, 2023, which ordered Adam to pay $491 a month for Apollo's child support. On March 14, 2024, Adam moved to add Rebecca as a third-party to the child support case. The district court approved the order adding Rebecca as a third-party on March 29.

- 1 -

On March 20, 2024, Adam filed for child custody and parenting time and requested that the district court review "the child support and the allocation of the parties' financial obligations." On June 10, Adam filed for temporary legal and physical custody of Apollo and for Rebecca to return Apollo to Lincoln, Nebraska. At a hearing on June 21, the district court stated that it had reviewed affidavits submitted by Adam, which opined that Adam had not had an opportunity to see Apollo for 6 months, as Rebecca had taken Apollo to Colorado. These affidavits were not included in the record. On June 25, the district court ordered that Adam receive temporary parenting time via video conference or phone on Tuesdays and Thursdays for 15 minutes. On July 23, the district court ordered that Rebecca return Apollo to Nebraska by August 9.

On October 10, 2024, Adam filed another motion for temporary legal and physical custody of Apollo. The motion stated that Rebecca had failed to return Apollo to Nebraska by the district court's August 9 deadline.

Another hearing on Adam's motion for temporary orders was held on November 7, 2024. That same day, the district court vacated its July 23 order requiring Rebecca to return Apollo to Nebraska because the district court believed it did not have jurisdiction over Rebecca when she removed Apollo.

Additionally, both parties were ordered to attend a parenting class. Adam's parenting class certificate of completion was received at trial. Rebecca did not provide proof of completion of the parenting class.

Trial was held on January 14, 2025, where the following testimony was adduced.

*Adam's Testimony.*

Adam has lived in Lincoln, Nebraska, his entire life where he currently lives in his own condominium. Both Adam's and Rebecca's families also primarily reside in Lincoln.

Adam testified that he has been involved in Apollo's life since the time of Rebecca's pregnancy, having participated in prenatal appointments. The parties jointly decided on Apollo's doctor and daycare provider. While Rebecca attended some of Apollo's appointments, Adam stated that he would primarily take Apollo to his appointments and daycare and would typically administer Apollo's medication.

According to Adam, prior to his removal, Apollo was doing well in the preschool program at his daycare and was making friends. Adam was the primary contact with daycare. Adam enjoyed spending time with Apollo, doing things such as going to the zoo, being outside, and watching movies. Adam testified that Apollo has a good relationship with Rebecca as well.

Adam and Rebecca continued living together with Apollo until August 2021. The parties had problems with their relationship, and Adam questioned Rebecca's decision-making abilities. Adam filed for paternity, but it was withdrawn after the parties decided to reconcile. The parties attempted to live together again until the fall of 2022, when Rebecca moved out of the home.

When Rebecca moved out, Adam testified that he primarily cared for Apollo and had more parenting time with him from fall of 2022 until late 2023. Rebecca continued to see Apollo at various times. Eventually, the parties were able to co-parent in late 2023. The parties alternated parenting time every other week from November 2023 until January 23, 2024.

On January 23, 2024, Adam discovered that Rebecca had taken Apollo with her to Denver, Colorado, without discussing it with him. Apollo had never lived anywhere other than Lincoln.

Adam did not believe that any of Apollo's family members lived in Colorado. Nor was he aware of any job opportunities for Rebecca in Colorado.

When Rebecca first left, Adam made several attempts to contact Rebecca without success. Eventually, "[s]he responded very vague[ly] saying, don't worry. And that was it." Rebecca never told Adam where she was living, only that she was living with another man with whom Adam was unfamiliar. Adam reported it was difficult to connect with Rebecca while she was in Colorado. By the time of trial, Adam had spent only three weekends with Apollo since the move to Colorado.

Adam was concerned about Apollo staying in Colorado because, to his knowledge, Apollo had no family members in Colorado to support him, other than Rebecca. Rebecca never told Adam information regarding Apollo's doctors in Colorado. Nor was he told who watched Apollo when Rebecca is working, only that Apollo was attending daycare. Adam also noted that Apollo's primary medical providers are in Lincoln.

Adam's current living situation allows Apollo to have his own room, and he owns clothes and toys for Apollo. Adam currently works overnights at Tractor Supply but plans on having a daytime schedule soon. Adam's mother can watch Apollo while he works overnights.

If Apollo was returned to Nebraska, Adam had plans for where Apollo would attend school and see a doctor. Adam would place Apollo in a new daycare close to his house.

Adam was unaware of any abuse allegations or investigations involving his relationship with Rebecca and Apollo. Adam testified that he pled to domestic assault in the third degree and criminal mischief against an unrelated party and was sentenced to probation. While Apollo was in Colorado, Adam served 2 days in jail for a probation sanction. Adam currently has a domestic abuse protection order against the same unrelated party.

At the time of trial, Adam proposed a parenting plan that gave him primary physical custody of Apollo. He testified that it was important to give as much parenting time to Rebecca as possible, given the distance between the parties.

*Rebecca's Testimony.*

Contrary to Adam's testimony, Rebecca stated that she was Apollo's primary caregiver since birth. She testified that she enrolled Apollo in daycare and scheduled his doctor appointments. She primarily took Apollo to his appointments, though she admitted that Adam attended a few.

Rebecca stated that when she moved out of Adam's house, the parties alternated watching Apollo every other week. According to Rebecca, Adam became inconsistent in his parenting time beginning November 2022, so she began primarily caring for Apollo.

While Rebecca currently lives in Colorado, she confirmed that most of her family lives in Lincoln. Rebecca said she tried to discuss moving to Colorado with Adam. She moved to Colorado because "it's always been our biggest joy," and to be with Alex Benamon, who also has family in Lincoln, and with whom she has lived since moving to Colorado. Rebecca has lived in two locations since moving to Colorado.

Rebecca admitted that she had not provided any information to Adam regarding Apollo's baby-sitters. She also never told Adam who Apollo's Colorado doctor was, though she stated that Adam never asked.

Prior to leaving for Colorado, Rebecca worked full-time cleaning houses at $17 an hour. She confirmed that she is currently self-employed making jewelry. She currently makes about $500 a month selling jewelry; in Nebraska, she made approximately $200 a month. She had also been cleaning houses in Colorado but was placed on temporary leave due to low demand. While cleaning houses in Colorado, she made about $300 a week.

Rebecca is currently on governmental benefits. Previously, Rebecca has not had experience paying her own bills because she lived either with Adam, or other family members, who paid the bills.

Rebecca ultimately requested that the district court not change Apollo's current schedule because it had been consistent for about 1 year. She stated that "we're pretty happy where we're at with our schedule and routine." Rebecca would be willing to offer Adam 2 weekends a month and summer break, consisting of May, June, and July.

*District Court's Order.*

The district court entered its order on May 14, 2025. The district court found that both parties were "fit and proper parents to have custody" of Apollo. However, the district court stated that Apollo had been living in Colorado for close to a year and a half. The district court found that it would not be in Apollo's best interests to return to Nebraska and "uproot his life." The district court ordered Rebecca to have sole physical custody of Apollo. The district court ordered Adam to pay $454 per month in child support.

Adam appeals. Rebecca did not file a brief in response.

## ASSIGNMENTS OF ERROR

Here, Adam failed to include an assignment of error section as required by Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2024). Adam's brief does not contain a separate assignments of error section and instead uses the subheadings in the argument section of the brief to assert error by the district court. We have consistently said that when assignments of error are presented in the argument section of an appellate brief, rather than a designated assignments of error section, an appellate court may proceed as though the party failed to file a brief (providing no review at all) or, alternatively, may examine the proceedings for plain error. *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023). In Adam's case, we exercise our discretion to review the proceedings for plain error.

The State in its cross-appeal assigns, restated, that the district court erred by modifying child support without finding a material change in circumstances.

## STANDARD OF REVIEW

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Noland v. Yost, supra.*

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Jones v. Colgrove*, 319 Neb. 461, 24 N.W.3d 1 (2025).

ANALYSIS

*Child Custody.*

In reviewing for plain error, we recognize Adam argues that the district court erred in not awarding him sole physical custody of Apollo.

Here, the district court found that both parties were "fit and proper parents to have custody" of Apollo. Adam does not contest that Rebecca is a fit parent. When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Jones v. Colgrove, supra.*

We begin by setting forth the legal framework for evaluating child custody determinations for the best interests of the child. Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody. *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025). Section 43-2923(6) states:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may also consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Scott v. Scott, supra.*

In its order, the district court did not elaborate on its best interest analysis. In reviewing the order, we observe that the district court did "not believe it is in the best interests of the minor child to return to Nebraska and uproot his life based on the evidence at trial." We are unable to find any other reasoning behind the district court's custody determination. While we recognize that the district court is not necessarily obligated to provide a detailed analysis in a custody case, it is the best practice for a district court to provide some detailed analysis in determining what is in the best interests of the child. See *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024).

Here, we will review the best interest custody factors for plain error.

Adam testified to how he spends time with Apollo, such as going to the zoo, being outside, and watching movies. No evidence was received on how Rebecca spends time with Apollo. However, Adam testified that Apollo has a good relationship with Rebecca.

No evidence was provided on Apollo's wishes.

Adam testified that Apollo has friends in Nebraska at his previous daycare. Though if Adam had sole physical custody of Apollo, he planned to place Apollo in a new daycare program. No testimony was provided on the health, welfare, and social behavior of Apollo in Colorado, except for Rebecca's statement that "we're pretty happy where we're at with our schedule and routine."

While Adam pled to domestic assault in the third degree and criminal mischief against an unrelated party, no evidence was provided of abuse between the parties and Apollo.

Based on our review, none of the required factors pursuant to § 43-2923(6) strongly favor one of the parties. We will next review the additional factors that may be considered when determining custody.

As to moral fitness, Adam pled to domestic assault in the third degree and criminal mischief. No evidence was presented on Rebecca's criminal background.

No evidence was provided on the parties' sexual conduct.

Adam testified that most of Apollo's family lives in Nebraska and that Apollo would have his own room with Adam. No evidence was provided on the environment, or living arrangement, of Apollo in Colorado, except that he had moved twice and lives with Rebecca and another man.

Both parties have a good relationship with Apollo, as discussed above.

No evidence was provided on how the parties' and Apollo's age and health affected the custody arrangements.

There was evidence provided on how Rebecca's actions disrupted the relationship between Apollo and Adam. First, Rebecca moved with Apollo to Colorado without Adam's permission. Adam testified that he was unable to contact Rebecca as to Apollo's whereabouts, which led to the current custody action and filing for temporary orders. Adam was unable to see Apollo for 6 months. Rebecca also failed to return Apollo pursuant to the district court's order, though this order was later vacated after the deadline had passed for Rebecca to return Apollo. No evidence was presented on how this disruption negatively affected Apollo. Instead, Rebecca indicated that Apollo appeared to be happy.

By the time of trial, both parties testified to their willingness to share parenting time with the other parent. Rebecca testified that she would be willing to offer Adam 2 weekends a month and summer break, consisting of May, June, and July.

As to the stability of each parent, Adam testified to owning and living in a condominium since Apollo was born. Rebecca has moved several times since Apollo's birth. She moved in and out of Adam's home and then lived in two different locations in Colorado.

The last factor to consider is the parent's capacity to provide physical care to the child. Adam testified to working overnights at Tractor Supply. His mother can watch Apollo overnight while he is working. Adam also discussed his intent to switch to daytime hours. Adam testified to having resources available for Apollo such as clothes and toys. While self-employed, Rebecca is currently on governmental benefits and has not had experience paying her own bills.

Both parties offered conflicting testimony on their level of involvement in Apollo's care. Both parties testified to being the primary caregiver in Apollo's life, though both parties admitted that at one point they shared equal parenting time. They also both testified to being the primary parent to take Apollo to doctor's appointments and daycare. We note that Adam provided evidence of attending the ordered parenting class to improve his ability to care for Apollo. Rebecca provided no evidence of attending the parenting class.

While there are factors that weigh against Rebecca's custody of Apollo being in his best interest, we cannot say that plain error exists. While Rebecca took Apollo with her to Colorado without Adam's permission, unwed mothers are initially entitled to automatic custody of their children. See *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). And even though Rebecca's behavior throughout the pendency of the case appeared to disrupt the relationship between Adam and Apollo, at the time of trial, Rebecca indicated her willingness to offer Adam ample parenting time to continue his relationship with Apollo despite the distance between the parties. See *Westerhold v. Dutton*, 28 Neb. App. 17, 938 N.W.2d 876 (2020) (considering opportunity parent had to build relationship with child despite distance, ultimately approving custody determination). Therefore, the district court's custody determination does not constitute plain error.

*Child Support.*

The State argues on cross-appeal that the district court erred in modifying child support because it did not find a material change in circumstances. Adam argues that the child support order was made in error as a result of the district court's error in awarding Rebecca sole physical custody. However, as discussed above, we do not find plain error in the district court's custody determination. We focus our attention on the State's argument.

The party seeking modification of child support has the burden of showing a material change in circumstances that (1) occurred subsequent to the entry of the original marital dissolution decree or previous modification and (2) was not contemplated when the decree was entered. See *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). A modification from a decree of paternity follows these same modification principles. See *State on behalf of B.M. v. Brian F.*, 288 Neb. 106, 846 N.W.2d 257 (2014).

Proof of a change of circumstances is not an optional element to a modification proceeding. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). It is an abuse of discretion to modify an existing child support order without first finding a material change in circumstances. See *Kotas v. Barnett*, 31 Neb. App. 799, 990 N.W.2d 37 (2023).

Here, we agree with the State that the district court abused its discretion when it did not explicitly find a material change in circumstances before modifying child support; and, based on our de novo review of the record, we are unable to find sufficient evidence of a material change in circumstances to warrant a modification of child support.

We first note that pursuant to the Nebraska Child Support Guidelines, Neb. Ct. R. § 4-217 states:

> Application of the child support guidelines which would result in a variation by 10 percent or more, but not less than $25, upward or downward, of the current child support obligation, child care obligation, or health care obligation, due to financial circumstances

which have lasted 3 months and can reasonably be expected to last for an additional 6 months, establishes a rebuttable presumption of a material change of circumstances.

Adam was previously ordered to pay $491 a month for Apollo's child support. The prior child support calculation worksheet is not contained in our record. The district court modified Adam's child support payment to $454 per month, based on the gross earned taxable income from Adam's proposed calculation worksheet that appears consistent with trial evidence. When comparing the previously ordered child support to the present calculation, the variation is less than 10 percent and does not establish a rebuttable presumption of a material change of circumstances. See, also, *Buderus v. Buderus*, 30 Neb. App. 589, 971 N.W.2d 359 (2022). We next review for any additional factors of a material change in circumstances.

Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

While both parties appear to have had changes in their employment, their financial positions appear to be relatively unchanged, considering the child support decrease found by the district court was less than 10 percent. Nor are we able to determine how much the parties' income has changed, as the previous child support calculation was not included in the record. No evidence was provided of a change in Apollo's financial needs. And while Rebecca is making less cleaning houses, she is making more in her jewelry business than she did in Nebraska. She also plans to return to cleaning houses once her temporary leave ends.

Adam had the burden to prove a material change in circumstances. Based on our de novo review, he provided insufficient evidence of a material change. Nor did he plead any specific allegations in his petition to warrant a modification of child support, only asking for the district court to review the child support order.

Therefore, the district court erred in modifying child support as there is insufficient proof of a material change in circumstances. We reverse the district court's modification of Adam's child support obligation and reinstate the child support obligation contained in the order establishing paternity on October 12, 2023.

## CONCLUSION

The district court's custody determination does not constitute plain error. However, the district court erred by not finding a material change in circumstances before modifying child support. Because there is insufficient proof of a material change in circumstances, we reverse the district court's modification of Adam's child support obligation entered on May 14, 2025, and reinstate the child support obligation contained in the order establishing paternity on October 12, 2023.

AFFIRMED IN PART, AND IN PART REVERSED.