Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/12/2025 09:08 AM CDT

Robert E. Scott, appellant, v.
Rebecca F. Scott, appellee.
___ N.W.3d ___

Filed September 12, 2025.    No. S-24-512.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.

4. ____: ____. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Child Custody.** The paramount consideration in determining child custody is the best interests of the children.

6. **Divorce: Property Division.** There is no mathematical formula by which property awards can be precisely determined, but, generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

7. ____: ____. Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process: (1) classify the

parties' property as either marital or nonmarital, setting aside the non-marital property or nonmarital portion of the property to the party who brought the property to the marriage; (2) value the marital assets and marital liabilities of the parties; (3) calculate and divide the net marital estate equitably between the parties.

8. **Divorce: Property Division: Equity.** The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided.

9. **Divorce: Property Division.** The date for valuation of property included in the marital estate in a dissolution decree must be rationally related to the property being divided.

10. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

11. **Divorce: Property Division.** In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the income and earning capacity of each party and the general equities of the situation.

12. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

13. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result.

14. **Attorney Fees.** Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.

15. **Divorce: Attorney Fees.** A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.

16. ____: ____. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

Amie C. Martinez and Megan M. Zobel, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Krista M. Carlson, of Carlson Family Law, P.C., L.L.O., for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Funke, C.J.

## I. INTRODUCTION

Robert E. Scott appeals the order of the district court for Lancaster County, Nebraska, dissolving his marriage to Rebecca F. Scott. Robert claims that the district court erred in awarding Rebecca primary physical custody of the parties' minor children and in other custody-related matters. Robert also claims that the district court erred in allocating the children's extracurricular expenses, dividing the marital estate, and awarding Rebecca alimony and attorney fees. Finding no merit to those arguments, we affirm the order of the district court.

## II. BACKGROUND

### 1. Events Prior to Trial

Robert and Rebecca married in 2005. They subsequently had three children, born in 2009, 2012, and 2014, respectively.

In September 2021, Rebecca obtained an ex parte domestic abuse protection order against Robert. Among other things, that order awarded Rebecca temporary custody of the children and required Robert to stay away from the marital home and the children's schools. In a subsequent order, the district court affirmed the protection order.

While the protection order matter was pending, Robert filed a complaint for dissolution of marriage, seeking custody of

the children. Rebecca subsequently filed an answer to Robert's complaint and a cross-complaint. In her cross-complaint, Rebecca also sought custody of the children.

In October 2021, upon stipulation of the parties, the protection order was amended to eliminate the provisions giving Rebecca temporary custody of the children and barring Robert from the children's schools. The court then entered a temporary order awarding Robert and Rebecca joint legal and physical custody of the children.

Several months later, in February 2022, Robert sought temporary custody of the oldest child. In response, Rebecca filed a motion alleging that the oldest child had been alienated from her and asking that a therapist be appointed to work with her and the child to "repair the relationship and resume regular parenting contact." The district court amended the temporary order to give Robert physical custody of the oldest child, subject to Rebecca's parenting time every other weekend. The parties continued to share legal custody of the oldest child, although Robert was granted final decisionmaking authority as to the child. There were no changes to the custody of the other two children. The court also sustained Rebecca's motion asking that she and the oldest child work on their relationship with a "neutral therapist."

## 2. Evidence at Trial

A bench trial was held over 6 days in September and November 2023. What follows is a broad summary of the evidence presented at trial regarding custody of the children. Additional evidence about custody and other matters is discussed later in the opinion insofar as it directly relates to the parties' arguments on appeal.

### (a) Robert's Witnesses

Robert presented testimony from Tim Riley, a clinical psychologist who had provided "several courses of therapy, some briefer, some a little bit longer," to the oldest

child in the 7 years before the trial. Riley testified that the child's "primary concern" was his relationship with Rebecca. According to Riley, the child reported that at times, Rebecca "actively ignored" him, gave him the "silent treatment," and "retreat[ed] to a different part of the house." Riley said he was aware that the child was sometimes "aggressive" with Rebecca, but he opined that the child acted out "to try to create a more consistent reaction from [her]."

Riley also opined that the oldest child was "doing well" in Robert's custody and that Robert was "very protective" of the child. Riley rejected the notion that Robert alienated the child from Rebecca, in part because the child "continued to express a desire to improve his relationship with [her]." Riley said that the child never expressed concerns about his ability to talk to Rebecca while with Robert. Instead, Riley said that the child was concerned about his "inability to contact [Robert]" while at Rebecca's house. Riley testified that solving problems like those between Rebecca and the child "normally require[s] the parent who has the poor relationship [with the child] to admit their mistakes and fault, in an attempt to make changes in the behavior towards that child." Riley said he was not aware that had occurred here. Riley also said that he offered to share his "insight[s]" with Michael Keady, the family therapist who began working with Rebecca and the child upon the court's order, but his offer was rebuffed.

Robert also presented testimony from his twin brother, his brother's wife, his best friend, and a former friend of Rebecca's whose son played golf with the oldest child. Those witnesses testified that Robert was a good father, that he attended the children's events, and that the children "love[d]" being with him. The witnesses also testified that the children were "good kids" and were "very well behaved and respectful" but that they "act[ed] out" against Rebecca. The witnesses stated that Rebecca had always distanced herself from Robert's family and that she "with[drew] more and more" after the children

were born. In particular, Robert's brother testified that in or around 2019, Robert became the "primary parent" because of Rebecca's withdrawal. The witnesses said that Robert had expressed concerns about Rebecca's "mental health" or "well[-]being" and had described efforts to "get her help." However, they viewed this as Robert being "supportive."

Robert himself testified similarly that from the time of their engagement, seemingly innocuous statements or actions prompted Rebecca to "explo[de]" and then "disappear for . . . hours, days" and "sometimes not talk to [him] for weeks." However, Robert stated that this behavior became more "pronounced" when the oldest child was 10 years old. In fact, Robert stated that he was the children's primary caretaker for the past several years because Rebecca "withdr[e]w completely for days on end." According to Robert, he and Rebecca consulted over a dozen "doctors, counselors, psychiatrists, psychologists and acupuncturists" in the 10 years prior to trial to address these issues. Robert testified that when a provider asked Rebecca to address her role in the situation, she changed providers. Robert testified that Rebecca would break off relationships with friends and family in a similar fashion, always "blam[ing]" others. Robert acknowledged that the oldest child acted out against Rebecca and said he had seen the other children behave similarly. But Robert insisted that he had admonished such behavior, even though he understood it was a "reaction" to Rebecca.

Robert testified that the children were doing well, although he suggested the younger children would benefit from more time with the oldest child because he was "so integral" to them. Robert also complained that he had "consistent problems" communicating with the children when they were with Rebecca, that she scheduled medical appointments for the children without telling him, and that she "failed to provide the medication that should go with the [children]." In addition, Robert introduced evidence that Rebecca "smack[ed]"

or "slap[ped]" the oldest child on the arm one morning when dropping him off at school. There was also evidence that Rebecca accused the middle child of "'caus[ing] the divorce'" and that the fire department responded to a fire the children started while in Rebecca's care.

#### (b) Rebecca's Witnesses

Rebecca presented testimony from Keady that he had provided therapy services to her and the oldest child for approximately 9 months. Keady testified that he observed the child talking about the divorce, that the child was "well informed" about the litigation, and that Keady had reason to believe the child's knowledge did not come from Rebecca. Keady stated that the child told him he would "make a great witness for [the child] and [Robert]." Keady also stated that the child described Rebecca as a "narcissist" and "mentally ill," just like Robert did during meetings with Keady. Keady opined that the child and Robert were "enmeshed" or had "blurred" boundaries. Keady testified that the child "idealized" Robert and "demonized" Rebecca, that he had no guilt for how he treated Rebecca, and that his support for Robert was "reflexive." As to Riley's offer to share information, Keady agreed it would "have been important" to know that "one of [the child's] primary problems" was feeling "shut down" by Rebecca. However, Keady said he did not know the validity of that information.

Rebecca also presented testimony from clinical psychologist Alan Blotcky about parental alienation. Blotcky testified that he had not met the parties or their children and did not "know anything at all about any of the facts in this particular case." Instead, Blotcky generally described parental alienation as "the intentional attempt of one parent to undermine a child's relationship with the other parent." According to Blotcky, "a diagnosis of parental alienation" requires the following five factors: (1) the child rejects the parent; (2) the alienated child and the rejected parent had a prior positive

relationship; (3) the rejected parent does not show any evidence of being "abusive, neglectful[,] or seriously deficient in parenting"; (4) alienating behaviors exist; and (5) the child exhibits the characteristics of an alienated child. Blotcky also opined that specific behaviors such as "badmouthing" and limiting contact were alienating and that alienated children were "totally negative" about the rejected parent.

In addition, Rebecca presented testimony from Lisa Blankenau, a counseling psychologist, who had treated her since November 2021. Blankenau testified that Rebecca had anxiety that was "especially triggered" by the divorce. Blankenau said that Rebecca's psychological evaluation showed this, as well as histrionic traits. Blankenau also testified that Robert's own psychological evaluation showed anxiety, depression, and anger, as well as histrionic and narcissistic traits. Blankenau stated that she met with Rebecca and the oldest child in March 2022 to determine if she was a good fit for family therapy with them and that it went "[t]errible." Blankenau said that the child attempted to record the conversation and that he "started talking about how [Rebecca] was crazy and asked if [Blankenau] was doing a psychological evaluation on her." Blankenau said that the child used "words that 12-year-olds usually don't use" and that this and other factors made her think his statements were "rehearsed."

There was also testimony from Rebecca's parents, her sister, her sister's partner, and three friends contradicting the description of the parties provided by Robert's witnesses. Rebecca's witnesses testified that she was a good mother; that she spent time with the children and coached their sports teams; that she was consistent in her dealings with the children; and that she did not ignore the children, give them the "silent treatment," or withdraw from them or others. Instead, Rebecca's witnesses testified that Robert was generally absent. Rebecca's witnesses said that they had heard Robert describe Rebecca as "mentally ill." Rebecca's

witnesses also said they had overheard Robert on the phone with the children disparaging Rebecca and her family, telling the children to disregard what Rebecca said, and asserting he would get "full custody." In addition, Rebecca's sister described an incident where Robert "threw [the oldest child] down onto the ice," even though the child had recently suffered a concussion.

Rebecca's own testimony similarly contradicted that of Robert's witnesses. In particular, Rebecca testified that she was never "diagnosed with" anything other than anxiety and adjustment disorder, although she suspected she had postpartum depression after the birth of the children. Rebecca also testified that she saw only four therapists over the past 18 years and that her inability to care for the children at times in 2020 and 2021 was not due to mental illness but because she was "working a lot." Rebecca said that Robert had perpetuated this "mental illness dialogue" about her with the children and others. Rebecca introduced evidence that the oldest child had said she "need[ed] help" in "exactly the way [Robert] said it." There was also evidence that the oldest child had described Rebecca as "'bipolar'" and as his "birther," not his mother. Rebecca said that Robert did not "give the children consequences" for hurting her but instead seemed to "enjoy" it.

Rebecca also testified about the children's academic and medical issues, including incidents when two of the children had "asthma attacks while biking without their inhalers" while in Robert's custody. According to Rebecca, she did not prohibit the children from contacting Robert, although she did require them to use specific devices and turn off their devices overnight. Rebecca testified that Robert interfered with her communication with the children and intruded on her parenting time. In addition, Rebecca described various instances when Robert "physically abuse[d]" the children, including throwing the oldest child onto the ice. Rebecca also testified

that Robert yelled at the children and drank alcohol from a flask while driving a vehicle with the children inside.

### 3. Dissolution Decree

After the trial, the district court entered a decree dissolving the parties' marriage. The court awarded Robert and Rebecca joint legal custody. However, it awarded Rebecca primary physical custody and the "final say in decisions concerning the children's medical, educational, and religious needs."

In so doing, the court said the oldest child had a "particularly close bond with [Robert]" but that Keady testified this "was an unhealthy bond that appeared to be enmeshment." The court also said the allegation that Rebecca hit the oldest child was a factor in its decision to amend the temporary order to give Robert primary physical custody of that child. However, the court found that "no other credible allegations of physical abuse" were made against Rebecca. The court similarly acknowledged Robert's allegation that Rebecca was "'mentally ill'" but found no evidence that either party's mental state prevented them from functioning as a parent. Instead, the court said that it was more concerned with "how each party attends to any mental health issues they may have and whether they are positive and effective role models." Ultimately, the court concluded that Rebecca, "for the most part, has acted in the children's best interests," while Robert's actions "have served to alienate the minor children" from her, even if that was not his intent.

The parenting plan incorporated into the decree incorrectly prohibited Rebecca from consuming alcohol during, or for 24 hours prior to, her parenting time, as is discussed below.

Also, as is relevant to this appeal, the court awarded Rebecca the parties' marital home in Lincoln, Nebraska, alimony of $5,000 per month for 9 years, and $30,000 in attorney fees. Robert was awarded the parties' cabin in Minnesota, but items of personal property from the cabin were awarded to Rebecca.

4. Subsequent Motions

Robert moved for a new trial, challenging the award to Rebecca of custody, alimony, attorney fees, the marital home, and personal property from the cabin. Robert also challenged:

• the requirement that he generally pay 70 percent of the children's vehicle, cell phone, and technology expenses and the "items required for their activities such as clothing, uniforms, or equipment";

• the district court's decision to value a specific investment account as of the date of the parties' separation;

• Rebecca's allegedly receiving items of his premarital and non-marital personal property that were not listed in the "Personal Property Division" in "Appendix E" of the decree; and

• the district court's failure to attribute to Rebecca the value of personal property included in an appraiser's report that Robert claimed was not included in Appendix E.

Rebecca, in turn, filed a motion for an order nunc pro tunc asking that the district court correct the decree to reflect that it is Robert who is barred from consuming alcohol in conjunction with his parenting time. Rebecca also sought changes to the decree based on the provisions regarding the children's vehicle and related expenses described above.

After a hearing, the court sustained in part Robert's motion and amended the decree to eliminate the provisions regarding the children's vehicle and related expenses. The court also clarified the provisions regarding personal property in Appendix E. Among other things, Appendix E was amended to state that

> [e]ach party is awarded as his/her sole and separate property, free and clear of any interest of the other, their premarital and nonmarital personal property unless otherwise awarded in Appendices D & E. [Robert's] gold coin collection and watches belonging to him or his family are specifically designated his nonmarital property and are awarded to him.

Otherwise, Robert's motion was overruled.

Rebecca's motion was sustained in part. Specifically, the parenting plan was amended to prohibit Robert from consuming alcohol in conjunction with his parenting time.

Robert appealed, and we moved the matter to our docket.[1]

## III. ASSIGNMENTS OF ERROR

Robert assigns, restated and reordered, that the district court erred in (1) "order[ing] the parenting plan," (2) allocating "extracurricular activity expenses" for the minor children, (3) dividing the marital estate, (4) awarding Rebecca alimony, and (5) awarding Rebecca attorney fees.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.[2] This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[4]

[3,4] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[5] When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024).

[2] *Seemann v. Seemann*, 318 Neb. 643, 18 N.W.3d 118 (2025).

[3] *Id*.

[4] *Id*.

[5] *Id*.

the witnesses and accepted one version of the facts rather than another.[6]

## V. ANALYSIS

### 1. Custody and Custody-Related Provisions

Robert's first assignment of error concerns the "parenting plan." Robert argues that the district court erred in (1) awarding Rebecca primary physical custody of the children; (2) giving her decisionmaking authority over medical, educational, and religious matters; and (3) ordering him to refrain from consuming alcohol in conjunction with his parenting time.

### (a) No Abuse of Discretion in Awarding Rebecca Primary Physical Custody

Robert claims that Rebecca should not have been awarded primary physical custody of the children. Instead, Robert claims that based on the evidence at trial, "at minimum," the district court should have "maintain[ed] the temporary custody order and parenting time schedule."[7] Rebecca disagrees.

[5] The paramount consideration in determining child custody is the best interests of the children.[8] Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody.[9] Such factors include the relationship of the minor child to each parent; the desires and wishes of the minor child; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household

---

[6] *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024).

[7] Brief for appellant at 19.

[8] *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[9] See, e.g., *Olson v. Olson*, 27 Neb. App. 869, 937 N.W.2d 260 (2019).

member; and credible evidence of child abuse or neglect or domestic intimate partner abuse.[10]

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may also consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.[11]

Reviewing this case de novo on the record, we cannot say the district court abused its discretion in concluding that it was in the children's best interests for Rebecca to have primary physical custody. In arguing otherwise, Robert primarily points to evidence in the record that was favorable to him. That evidence generally concerns (1) the children's relationship to each parent; (2) the children's health, welfare, and social behavior; (3) credible evidence of abuse; (4) the effect on the children because of continuing or disrupting an existing relationship; and (5) the parents' moral fitness and character and the environments they offered. Broadly summarized, the evidence showed that Robert had a good relationship with the children, that the children were doing well under the current custody arrangement, and that there were issues with Rebecca that Robert claims should have precluded her from being awarded primary physical custody of the children, including her mental illness, her history of failed relationships that she blames on others, and her interference in the children's relationships with Robert and his family.

[10] *Id*.

[11] *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

The district court heard all this evidence and also heard other evidence regarding these factors, favorable to Rebecca, and it awarded primary physical custody of the children to Rebecca. Under the standard of review previously noted, even when reviewing a case de novo on the record, where evidence is in dispute, we may give weight to the fact that the fact finder heard and observed the witnesses and accepted one version of the facts rather than another.

Robert also takes issue with specific aspects of the district court's decision, including its "improper[] reli[ance]" on Keady's testimony in concluding that Robert had an "unhealthy bond" with the oldest child.[12] Robert points to the fact that Keady had only worked with the child for a few months and "refused to receive or consider collateral information from more knowledgeable professionals," such as Riley.[13] We see no issue with the district court's reliance on Keady's testimony here. The district court heard the evidence regarding how long Keady had been treating the oldest child, Riley's offer to share his "insight[s]" with Keady, and Keady's reasons for declining that offer. We also observe that there was other evidence, beyond Keady's testimony, to support the view that Robert's relationship with the oldest child was problematic. Blankenau testified that the child attempted to record her session with him and Rebecca and that he used "words that 12-year-olds usually don't use."

We take a similar view of Robert's claim that the district court "improperly found no credible evidence of abuse by Rebecca towards [the oldest child]."[14] We do not understand the district court to have made such a finding. Instead, after explaining the role the allegation that Rebecca hit the oldest child had played in its decision to award Robert temporary custody of the child, the district court found that "[t]here

---

[12] Brief for appellant at 19.

[13] *Id*. at 19-20.

[14] *Id*. at 24.

were no other credible allegations of physical abuse made against [Rebecca]." However, looking solely to the incident where Rebecca allegedly hit the child, we observe the district court correctly noted that Rebecca denied the allegation, that the school counselor who observed the incident testified in a deposition that she did not see any "red marks" or bruising on the child, and that Riley himself viewed the allegation as "minor" and "not concerning." As such, we see no abuse of discretion in the district court's conclusion that credible evidence of abuse did not weigh against awarding Rebecca primary physical custody.

We take a similar view of Robert's claim that the district court's statement that its primary concerns, as to mental health, were how the parties attended to the children's needs and whether they were role models for the children was "inconsistent with awarding Rebecca custody."[15] Robert claims that Rebecca's denial of "mental illness" was not credible in light of evidence that she "withdrew from the [children] for days at a time," withheld affection from them, and gave them the "silent treatment."[16] However, Robert ignores the conflicting testimony that Rebecca exhibited none of those behaviors.

Robert also relies on a "[p]atient [i]nformation" form where Rebecca wrote "mental illness affects everything [she does]," Rebecca's admission at trial that she had postpartum depression, and the psychological evaluation showing that Rebecca has what Robert characterizes as "problematic personality features, such as histrionic personality style and unspecified personality (turbulent) style."[17] However, there was also evidence that the patient information form was completed 2 months after the youngest child was born—at a time when Rebecca was believed to have postpartum depression, that postpartum

---

[15] *Id*. at 26.

[16] *Id*. at 27.

[17] *Id*.

depression lasts for a "short term" after a child's birth, and that Robert's own psychological evaluation revealed anxiety, depression, anger, and "significant histrionic and narcissistic personality features/style."

Nor are we persuaded by Robert's claim that the district court erred in relying on Blotcky's testimony to "find[] parental alienation."[18] Robert points to evidence he claims shows that he did not engage in parental alienation, but that Rebecca did. Robert also argues there should have been expert testimony that there was parental alienation and that absent such testimony, the district court erred in "diagnos[ing]" parental alienation.[19] However, the evidence as to whether Robert or Rebecca engaged in alienating behavior is—once again—less conclusive than Robert suggests. Also, the district court did not purport to rely on a diagnosis of parental alienation in determining custody. Instead, consistent with opinions of this court and the Nebraska Court of Appeals dating back over 60 years, the district court considered the specific conduct alleged to be alienating in determining the best interests of the children.[20] There was no error in so doing.

(b) No Abuse of Discretion in Granting
Rebecca Decisionmaking Authority
on "Legal Custody Issues"

Robert also argues the district court abused its discretion in granting Rebecca final decisionmaking authority over the children's medical, educational, and religious needs. Robert

[18] *Id*. at 34.

[19] *Id*.

[20] See, e.g., *Hossack v. Hossack*, 176 Neb. 368, 374, 126 N.W.2d 166, 170 (1964) ("'conduct toward a child which tends to poison the child's mind against, and alienate his affection from, his mother or father, is so inimical to the child's welfare as to be grounds for a denial of custody'"); *Conley v. Conley*, 33 Neb. App. 98, 121, 11 N.W.3d 671, 688 (2024) (court considering "actions" of one parent that allegedly "undermine" other parent's relationship with child when assessing children's best interests). See, also, *Larson v. Larson*, 33 Neb. App. 609, 23 N.W.3d 670 (2025).

points to evidence that he claims "should have raised concerns about [Rebecca's] ability to make decisions in [the] children's best interests regarding mental health."[21] As such, Robert argues that "[a]t minimum, the record supports joint legal custody with Rebecca maintaining final decision-making authority on education, dental[,] and religious issues, and [him] having final say on mental health issues."[22] Rebecca counters that the district court properly awarded her final say over medical, educational, and religious matters because she historically made those decisions for the children.

Upon our de novo review of the record, we agree with Rebecca that the district court did not abuse its discretion in granting her final decisionmaking authority over the specified matters. As the district court observed, the "last years of the [parties'] marriage [were] unusually hostile," and that hostility continued during the dissolution proceedings. Each party complained of the other's failure to meet the children's medical and educational needs and expressed concerns about the other's decisionmaking. There were also complaints about communication between the parties. This supports the district court's conclusion that one party needed to have final decisionmaking authority.[23]

As to the district court's conclusion that Rebecca specifically should have that decisionmaking authority, there was evidence that Robert missed a well-child check and delayed seeking dental care and physical therapy for the oldest child; that Rebecca coached the children's sports teams, volunteered in their classrooms, and helped with their homework; and

---

[21] Brief for appellant at 35.

[22] *Id.*

[23] See, e.g., *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018) (courts typically do not award joint legal custody when parties are unable to communicate effectively), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

that the children attended church with her. Robert seemingly concedes as much, insofar as he suggests that even if Rebecca were to be given final decisionmaking authority over education, dental, and religious issues, he should have final say over matters of mental health. However, the evidence that Robert relies upon to argue against giving Rebecca final say over matters of mental health was disputed at trial, and there was evidence that Robert used allegations of mental illness to disparage Rebecca to the children.

### (c) No Abuse of Discretion in Ordering Robert to Abstain From Alcohol in Conjunction With His Parenting Time

In addition, Robert argues the district court abused its discretion in ordering him to abstain from alcohol in conjunction with his parenting time. Robert claims the only incident that Rebecca relates regarding his alcohol use allegedly affecting the children occurred in March 2017 and was too remote in time. Robert here refers to the testimony by Rebecca and her sister that he "threw" the oldest child down onto the ice. Otherwise, Robert claims there was no evidence he had issues with alcohol or that Rebecca had previously had concerns about his alcohol consumption.

We again see no abuse of discretion. Robert is correct that the 2017 incident was the only incident testified to at trial where Robert allegedly physically harmed a child while he was allegedly intoxicated. However, there was other evidence that Robert drank around the children and "g[o]t angry" when he drank. There was also evidence that Robert drank while driving a vehicle. Rebecca testified that Robert would "put . . . alcohol in a flask or in a mug and he would drive with alcohol," including when the children were in the vehicle. Robert himself admitted some of this, testifying that he "used to carry flasks in [his] bag" and that he had carried alcohol in his vehicle. In addition, Robert's psychological evaluation noted signs of developing a problem with alcohol, "at least in the past."

### 2. Ordering Robert to Contribute Specified Percentages of Costs of Minor Children's Extracurricular Activities

Robert's second assignment of error concerns the requirement that he pay 70 percent of the costs of any extracurricular activity previously agreed upon by the parties that occurs during both parties' parenting time and 100 percent of the costs of any activity that occurs solely during his parenting time or to which Rebecca did not consent prior to the children's enrollment. Robert argues, summarized, that this requirement would have been proper if he had been awarded joint custody. However, Robert argues that because Rebecca was awarded primary physical custody, those expenses should be paid by her. Robert bases this argument on the fact that Neb. Ct. R. ch. 4, art. 2, worksheet 1 (rev. 2016), was used to determine his monthly child support obligations. Robert claims that the "[w]orksheet 1 computation . . . limits the additional obligations to out-of-pocket medical, dental, orthodontic, and vision expenses not covered by insurance."[24] Rebecca, in turn, argues that the Court of Appeals "examined this exact issue and approved of"[25] a similar provision regarding extracurricular expenses in *Kelly v. Kelly*.[26]

We agree with Rebecca that *Kelly* effectively forecloses Robert's arguments regarding the requirement that he pay specified percentages of the costs of extracurricular activities. In *Kelly*, as in this case, the mother was awarded physical custody of the minor children, and the father was required, in relevant part, to pay 70 percent of all expenses for previously agreed-upon extracurricular activities.[27] On appeal, the father challenged the requirement that he pay the specified

---

[24] Brief for appellant at 46.

[25] Brief for appellee at 36 (citing *Kelly v. Kelly*, 29 Neb. App. 198, 952 N.W.2d 207 (2020)).

[26] *Kelly, supra* note 25.

[27] See *id*.

percentage of the extracurricular expenses, claiming that this requirement constituted an abuse of discretion.[28] The Court of Appeals rejected that argument.[29]

In so doing, the Court of Appeals relied upon this court's view that Neb. Rev. Stat. § 42-364.17 (Reissue 2016)

provides categories of expenses incurred by a child which can be ordered by a trial court *in addition* to the monthly child support calculation determined under the guidelines. . . . One incident of support is the regular monthly payment established under the Nebraska Child Support Guidelines. . . . "But the guidelines recognize other incidents of 'support' that are wholly or partly outside of the monthly installment." . . . "The expenses stated in § 42-364.17—including, among others, extracurricular, education, and other extraordinary expenses—merely represent other incidents of 'support' to be addressed in a dissolution decree."[30]

The Court of Appeals concluded that because extracurricular expenses were specifically referenced in § 42-364.17, the district court did not abuse its discretion in allocating those expenses between the parties as it did.[31]

Robert's argument here is slightly different, insofar as he claims that worksheet 1 limits the expenses that a noncustodial parent can be required to pay to specified items and that extracurricular expenses are not among those items.

---

[28] See *id.*

[29] See *id.*

[30] *Kelly, supra* note 25, 29 Neb. App. at 210, 952 N.W.2d at 217 (citations omitted) (quoting *Caniglia v. Caniglia*, 285 Neb. 930, 830 N.W.2d 207 (2013)).

[31] See *Kelly, supra* note 25. But see *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020) (district court abused its discretion in requiring noncustodial father to purchase approximately one-half of children's clothing because § 42-364.17 does not expressly mention such expenses, and they cannot be seen as "extraordinary expenses").

However, we see nothing in worksheet 1 or in Neb. Ct. R. § 4-206 (rev. 2020) that imposes such a limit.

### 3. No Abuse of Discretion in Dividing Marital Estate

Robert's third assignment of error concerns the "division of the marital estate." In particular, Robert challenges the disposition of certain personal property, the valuation of an investment account, and the award of the marital home to Rebecca.

[6] We have previously stated:

> Neb. Rev. Stat. § 42-365 (Reissue 2016) provides for the "division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, [and] a history of the contributions to the marriage by each party," and, further, § 42-365 provides that "[t]he purpose of a property division is to distribute the marital assets equitably between the parties."[32]

There is no mathematical formula by which property awards can be precisely determined, but, generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.[33]

[7] Under § 42-365, the equitable division of property is a three-step process: (1) classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage; (2) value the marital assets and marital liabilities of the parties; (3) calculate and divide the net marital estate equitably between the parties.[34] In the present case, there is no dispute over the property's classification. Instead, the disputes primarily concern the valuation of one marital asset and the division of the net marital estate.

---

[32] *Stava, supra* note 6, 318 Neb. at 41, 13 N.W.3d at 192.

[33] *Id.*

[34] *Karas v. Karas*, 314 Neb. 857, 993 N.W.2d 473 (2023).

### (a) Personal Property From Cabin

Robert argues that the district court erred in awarding Rebecca personal property from the parties' cabin. Robert claims that it was "not equitable and appeared to be an oversight[] for the trial court to award Rebecca the personal property located at a residence not awarded to her."[35] Rebecca counters that Robert forfeited his right to challenge the issue on appeal because he has "already accepted the benefits of the [dissolution] [d]ecree with respect to the personal property [that] he was awarded."[36]

Rebecca produced an affidavit in conjunction with her opposition to Robert's motion for a new trial stating that after the decree was entered, Robert "took at least six truckloads/trailer loads of personal property from the marital home." We have held that generally, under the acceptance of benefits rule, an appellant may not voluntarily accept the benefits of part of a judgment in the appellant's favor and afterward prosecute an appeal or error proceeding from the part that is against the appellant.[37] Because of various issues with the identification of the personal property in this case, as discussed in greater detail below, we cannot confidently state that Robert waived his right to appeal the issue of the personal property from the parties' cabin. The result, however, is the same as if Robert had waived the issue.

Despite Robert's argument to the contrary, the award to Rebecca of the personal property at the cabin does not appear to be an "oversight."[38] The district court based its division of personal property on an exhibit that listed property by location, clearly identifying specific items as being in the cabin or the marital home. The district court's order did likewise. Subsequently, at the hearing on his motion for a new trial,

---

[35] Brief for appellant at 37.

[36] Brief for appellee at 27.

[37] *Gentele v. Gentele, ante* p. 182, 21 N.W.3d 599 (2025).

[38] Brief for appellant at 37.

Robert raised this same exact issue, arguing that awarding the personal property at the cabin to Rebecca was an "oversight." The district court did not amend the decree in relevant part, nor did it state its reasons for overruling Robert's motion in relevant part. However, the district court did note Rebecca's argument that if Robert were awarded the personal property at the cabin, he would have "all of the furniture and personal property because he has already taken the furniture and property he wanted from the marital home." We surmise the district court's legal rationale from this statement and cannot say it abused its discretion in so concluding.

### (b) Robert's Premarital and Nonmarital Personal Property

Robert also argues that the division of personal property set forth in the decree, as modified, "failed to set off [his] undisputed premarital property."[39] In particular, Robert points to family silver, watches, and furniture, as well as other premarital furniture and artworks, that he seemingly suggests were not awarded or returned to him. Rebecca counters that "almost everything of which [Robert] complain[s]" was awarded to him.[40] Rebecca also claims that regardless of whether the items were awarded to Robert, she returned all of Robert's "premarital personal items" to him.[41]

We see no abuse of discretion here. The record before us shows that at trial, Robert relied primarily on exhibits 13 and 19 as evidence of his premarital personal property. In relevant part, exhibit 13 includes broad references to "[f]amily silver," "[o]ld family furniture bedroom sets," and similar items, while exhibit 19 includes receipts for "armchairs," "etageres," and similar items. The district court did not

---

[39] *Id*. at 38.

[40] Brief for appellee at 29.

[41] *Id*.

expressly reference either of those exhibits in the division of personal property in Appendix E. Instead, the district court relied on Rebecca's exhibit 252, which the court viewed as "more accurate as to the value of the . . . property." Nonetheless, in Appendix E, Robert was awarded "silver and kitchen ware," a sterling silver set, a painting, and multiple pieces of furniture that were identified as premarital property.

Robert then moved for a new trial, pointing to a listing of personal property allegedly not included in Appendix E that he claimed was effectively awarded to Rebecca insofar as it was in the marital home. Robert asked that the decree be amended to state that he was awarded his premarital and nonmarital property, "'including [specific] items from [his] Exhibit 13 . . . and [the] furniture itemized in Exhibit 19.'" The district court declined to adopt this approach, although it did add the language about Robert's premarital property quoted above. The district court reiterated its view that exhibit 252 "was complete, accurate, and more clearly identified the items to be awarded." In contrast, the district court said Robert's lists were "vague, inaccurate, and contained items that were duplicated [or] could not be identified."

On appeal, Robert renews his claim that not all his premarital personal property was returned to him. However, Robert failed to specifically identify such property so that we can compare it to the list of personal property in Appendix E. Robert resorts to the broad terminology of "silver," "tables," and so on used in his exhibits. However, such listings are insufficient to show that Robert failed to receive his premarital personal property.

### (c) Personal Property Allegedly Not Accounted for in Decree

Robert similarly argues that there was personal property listed in the appraiser's report, but not listed in Appendix E,

that was effectively awarded to Rebecca "at no value."[42] Robert claims that the total value of this property was nearly $17,000 and that, as such, there should be a corresponding reduction in his equalization payment to Rebecca.

Once again, we see no abuse of discretion. When he raised this same issue before the district court in conjunction with his motion for a new trial, Robert prepared a listing of items that he claimed were in the appraiser's report but were not reflected in Appendix E. However, our review of this listing suggests that a number of those items were included in Appendix E under slightly different names, as shown in the table below.

| Items allegedly not included in decree's division of personal property, according to Robert: | Item included in decree's division of personal property: |
| --- | --- |
| Two upholstered chairs, $650 | Two wingback chairs, $650 |
| Six dozen Riedel crystal wine glasses, $1,080 | Riedel glasses from wedding, $1,080 |
| Waterford crystal standing cross jubilation, $40 | Jubilation cross, $40 |
| Mariposa pasta bowl, $70 | "Maraposa" bowl, $70 |
| Cast iron and wicker shelving unit, $110 | Cast iron and wicker shelving unit, $110 |
| Refrigerator, $1,300 | Subzero refrigerator, $1,300 |
| Freezer, $1,400 | Subzero freezer stand alone, $1,400 |
| Battery circular saw, $75 | Battery circular saw, $75 |
| Chicken house, $600 | "A frame" chicken coop, $600 |

---

[42] Brief for appellant at 39.

### (d) Valuation of Investment Account

Robert further claims the district court erred in valuing a specific investment account at $232,360 "as of the date of [the parties'] separation."[43] Instead, Robert argues that the district court should have valued the account at $141,568 as of December 31, 2021. Robert argues that the district court otherwise applied the December date to "nearly every asset and debt" involved in the dissolution and that its failure to do so here increased his equalization payment to Rebecca by over $45,000 that "no longer existed."[44] Rebecca counters that the district court was within its discretion in valuing the account as of the date of the parties' separation.

[8,9] The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided.[45] It is well settled that, generally, the date for valuation of property included in the marital estate in a dissolution decree must be rationally related to the property being divided.[46] We have declined to tie the hands of the district court and mandate that it must use only one particular valuation date in equitably dividing a marital estate.[47] The date of valuation is reviewed for an abuse of the trial court's discretion.[48]

We agree with Rebecca that there was no abuse of discretion here. In his opening arguments at trial, counsel for Robert claimed that "[w]e have reached an agreed upon valuation date of December 31st, 2021." However, counsel for Rebecca disagreed, stating that the parties' agreement was limited to the date of valuation of the parties' businesses and "not all the other assets."

---

[43] *Id.* at 40.

[44] *Id.*

[45] *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

[46] *Karas, supra* note 34.

[47] See *id.*

[48] *Radmanesh, supra* note 45.

The district court used dates other than December 31, 2021, to value other assets, whose valuations Robert does not challenge. In particular, the district court used the date of the parties' separation in valuing similar accounts. We find that choice of date to be rationally related to the specific account at issue here. As Rebecca argues, the record shows that the account was in Robert's name and that, as such, she "had no control over it after the date [the parties filed for dissolution]."[49]

### (e) Award of Marital Home to Rebecca

Finally, Robert argues that it was "illogical" to award the marital home, valued at $1.5 million, to Rebecca because she "cannot afford it."[50] Robert claims that Rebecca testified at trial that even with child and spousal support, "it was going to be difficult to afford her monthly living expenses if awarded [the marital home]."[51] He also points to evidence of the amount owed in mortgage payments and taxes on the property. Rebecca disagrees.

We see no abuse of discretion here. Rebecca was awarded primary physical custody of the children and, as Robert himself testified at trial, the marital home had numerous improvements made for the benefit of the children. Also, the district court ordered Robert to pay Rebecca an equalization payment of $614,272.23, a payment that would have been helpful in refinancing the mortgage, as she argues.

### 4. Alimony

Robert's fourth assignment of error concerns the district court's decision to award Rebecca alimony of $5,000 per month for 9 years. Robert primarily argues that the alimony

---

[49] Brief for appellee at 32.

[50] Brief for appellant at 41.

[51] *Id.*

awarded was "excessive based on the evidence."[52] Rebecca counters that the award of alimony was warranted based on the parties' respective financial circumstances and assets, among other things.

[10,11] In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.[53] In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities of the situation.[54]

[12,13] The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.[55] In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result.[56] The ultimate criterion is one of reasonableness.[57] An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.[58]

Based on the record before us, we see nothing untenable with the district court's award of alimony to Rebecca.

---

[52] *Id*.

[53] *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021). See, also, § 42-365.

[54] *Seivert, supra* note 53.

[55] *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

[56] *Id*.

[57] *Id*.

[58] *Id*.

The district court considered the relevant factors, including Robert and Rebecca's respective financial circumstances,[59] their 18-year marriage, and the evidence that Rebecca worked part time for most of that period to care for the parties' children.

Robert's primary argument to the contrary is that the "process" that the district court used to "determine income for alimony purposes . . . was unfair" because it overstated his income and understated Rebecca's.[60] Robert specifically takes issue with the manner in which Rebecca's expert determined the parties' respective incomes. However, the income that the district court attributed to Robert came from evidence that he himself presented. The district court stated that Robert made between $312,842 and $390,000 per year. Those numbers match numbers given by Robert in exhibit 6 and exhibit 302, respectively. Furthermore, the evidence that Robert presented, and upon which the district court relied, took into account his "lowest-earning year,"[61] something that Robert faults Rebecca's expert and, apparently, the district court for failing to do.

Granted, the district court did not rely on Robert's evidence as to Rebecca's income. According to Robert's evidence, Rebecca had an average annual income of $138,806. Instead, the district court relied on Rebecca's evidence in impliedly concluding that she had an average annual income of $81,429. Robert essentially argues that his higher number should have been adopted because Rebecca's lower number did not reflect the fact that her income in 2020 and 2021 was, he claims, exceptionally low because she relied on

---

[59] See, e.g., *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996) (wife's trust funds, while not subject to division in property settlement, were properly taken into account in determining alimony).

[60] Brief for appellant at 41.

[61] *Id*. at 43.

retained earnings from her business to pay her expenses in those years. However, even if the district court had adopted Robert's number, Rebecca's income would still have been less than her monthly expenses (excluding attorney fees). That factor was one of the primary reasons for the award of alimony here.[62]

Robert seems to suggest that despite only working part time during the marriage, Rebecca should not be seen to have "sacrifice[d] her own personal career advancement," but instead to have "continued to run a successful business."[63] Rebecca's business could perhaps be seen to have been "successful" during the marriage insofar as it provided her income and, at times, employed other dentists. However, it was not unreasonable to conclude that however successful the business was when Rebecca worked 1 to 2 days per week, it would have been more successful had she worked full time. We also note there was no evidence of other dentists who worked for Rebecca at the time of the trial.

Robert also points to our case law stating that a party's alimony obligation is to be set according to the income he or she has available after his or her child support obligations, if any, have been accounted for, with the apparent implication that the award here is improper under that standard.[64] However, by Robert's own calculations, his monthly income after his child support and alimony obligations have been paid is $18,294,

---

[62] See, e.g., *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (finding no abuse of discretion where district court's alimony award tends to even out disparity in parties' financial resources and provides wife with means to partially recapture standard of living that she and husband jointly put together during their 19 years of marriage); *Pyke v. Pyke*, 212 Neb. 114, 321 N.W.2d 906 (1982) (superseded by statute on other grounds as stated in *Karas, supra* note 34; recognizing that one policy underlying § 42-365 is to minimize any substantial and unnecessary disruption in lives of parties occasioned by reason of dissolution).

[63] Brief for appellant at 43.

[64] See, e.g., *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018).

and he does not suggest he is unable to support himself on that amount.

### 5. No Abuse of Discretion in Awarding Rebecca Attorney Fees

Robert argues the district court erred in awarding Rebecca $30,000 in attorney fees "solely based upon the disparity in income and financial status of the parties."[65] Robert implicitly acknowledges that Rebecca's attorney fees were sizable. However, he claims this was because the case was an "extremely complicated" one that lasted over 2 years due to factors other than his actions.[66] Robert also suggests that Rebecca was well compensated without the award of attorney fees. Robert argues that Rebecca received the marital home, "a $614,272.23 judgment to equalize the marital estate," and alimony of $5,000 per month for 9 years, "leav[ing him] with less available monthly income than [she has]."[67] Rebecca disagrees. Among other things, Rebecca argues that the amount of attorney fees awarded to her is a fraction of the fees that she incurred during the proceedings. She also argues that she has yet to pay off her attorney fees.

[14-16] Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.[68] A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.[69] In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required

---

[65] Brief for appellant at 47.

[66] *Id*. at 48.

[67] *Id*.

[68] *Beatty v. Poitier, ante* p. 56, 21 N.W.3d 295 (2025).

[69] *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.[70]

Here, because both parties assert the case was complicated, we presume that it was such. There was a significant amount at issue; the marital home alone was valued at $1.5 million. The affidavit of Rebecca's current attorney reflected 558 hours of work at $225 per hour. However, Rebecca was represented by other attorneys at the start of the proceedings and, in total, incurred $225,576.83 in attorney fees. We also note that Rebecca's total attorney fees are less than the fees incurred by Robert and that the hourly rate of Rebecca's current attorney is less than that of Robert's attorney. Although Rebecca did not prevail on every argument she made during the proceedings, she was awarded primary physical custody of all three children and final decisionmaking authority as to the children. Under these circumstances, we cannot say that the district court abused its discretion in awarding Rebecca $30,000 in attorney fees.

That conclusion is not altered by the financial considerations that Robert noted above. The record here shows that the district court took the equalization payment into consideration when awarding attorney fees but concluded the amount of that payment was not equal to the "mortgage remaining on the marital home, which [Robert] has requested [Rebecca] either pay or refinance." Similarly, as to the alimony awarded to Rebecca, the record shows that the district court deducted the amount that Rebecca was paying for attorney fees from her monthly expenses when determining spousal support. In other words, the district court did not effectively count that amount against Robert twice.

## VI. CONCLUSION

For the reasons set forth above, we conclude that Robert's assignments of error regarding the parenting plan, the allocation

---

[70] *Id.*

of the children's extracurricular expenses, the division of the marital estate, and the award of alimony and attorney fees to Rebecca are without merit. As such, we affirm the order of the district court.

Affirmed.