IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

TRENT V. TRENT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KENNETH F. TRENT, APPELLANT,

V.

LIZA J. TRENT, APPELLEE.

Filed December 16, 2025.    No. A-24-821.

Appeal from the District Court for Douglas County: LEANNE M. SRB, Judge. Affirmed.

Matthew S. Higgins and Liam K. Meehan, of Higgins Law, for appellant.

Haley L. Cannon and Brent M. Kuhn for appellee.

PIRTLE, WELCH, and FREEMAN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Kenneth F. Trent appeals from the Douglas County District Court's decree dissolving his marriage to Liza J. Trent, now known as Liza Janel. He takes issue with the court's award of legal and physical custody of four of the parties' children, the lack of parenting time with one of the children, the division of the marital estate, and the award of alimony and attorney fees to Liza. Based on the reasons that follow, we affirm.

## BACKGROUND

*Procedural Background.*

Kenneth and Liza were married in June 2004 in the state of Washington. The parties had six children: Kyryi, born in 2005; Eli, born in 2006; Lailah, born in 2007; Levi, born in 2009, Brigham, born in 2011; and Cal, born in 2013.

- 1 -

In January 2022, Kenneth moved out of the family home and moved to Washington, where the family had lived prior to moving to Nebraska. Kenneth filed a complaint for dissolution of marriage in March.

Kenneth filed an amended complaint in July 2022, which alleged that Liza was "generally, mentally and emotionally impaired such that it would not be in the child's [sic] best interests to have their care, custody or control awarded to her." The amended complaint also requested that Kenneth be granted permission to remove the children from Nebraska to Washington. At the time, Eli was residing in Washington with Kenneth and the other five children were living with Liza in Nebraska.

Liza filed an answer to the amended complaint and counter-complaint, alleging she was fit and requesting that she be awarded sole legal and physical custody of all the children except Eli. Her counterclaim alleged that the parties should have joint parenting time with Eli.

In November 2022, Kenneth filed a motion requesting, in part, that the family participate in weekly family counseling, and that the children participate in standardized educational testing. The motion alleged that Liza was no longer home schooling the children but instead was utilizing a method called "unschooling" and that the children had not been subjected to a standardized test since 2020. In response to the motion, the court ordered family counseling to take place with Dr. Theodore DeLaet and ordered standardized testing for the children.

In March 2023, Liza filed a first amended answer to the amended complaint and counter-complaint, which asserted for the first time that there had been abuse during the marriage involving the minor children and that the requirements of Neb. Rev. Stat. § 43-2932 (Reissue 2016) applied. Kenneth denied the allegations in an answer.

In July 2023, Kenneth filed a motion requesting the court to enter an order adopting the recommendations made by DeLaet in his report. The motion also alleged Liza was no longer home schooling the children and that results of standardized testing showed the children were performing below average in several areas, and requested the court enter an order requiring the children to be enrolled in public school. Kenneth also filed a motion requesting a child custody evaluation, which the court granted and ordered DeLaet to perform.

In September 2023, the court entered an order declining to adopt all of DeLaet's recommendations in his report but adopting his recommendation that the minor children attend in-person therapy. Jody Jurgens was chosen as the therapist.

*Trial.*

Trial occurred over 4 days in March and May 2024. The court heard testimony from both parties, five of the six children, DeLaet, and Jurgens.

The parties lived in several states during the marriage, including Idaho, Utah, Washington (twice), and Nebraska, as well as the country of Luxembourg. They moved from Luxembourg back to Washington in 2017, and in 2020, they relocated to Omaha, Nebraska. The moves were always attributed to Kenneth's job.

During the marriage, Kenneth obtained a bachelor's degree in 2006, a master's degree in 2011, and a second master's degree in 2013. Around the same time Kenneth earned his bachelor's degree, Liza obtained an associate's degree. Throughout the marriage, Kenneth worked outside the home and Liza stayed at home with the children. Liza also home schooled the children. At

some point before their oldest child started school, the parties had agreed to Liza staying home and home schooling the children.

Prior to the parties' separation in January 2022, the children's education became a point of contention between the parties. For years, Liza had followed a structured home schooling program and a set daily schedule. However, at some point in 2020, Liza decided she wanted to implement a different approach to home schooling, called "unschooling," based on a book she had read. The method is an unstructured, child-driven education process where the children decide what to study and develop their own study strategies. There are no grades and no tests.

Kenneth testified that prior to implementing the unschooling method, he and Liza discussed it, and a week later she started implementing it. Kenneth testified that he continued living in the home for about 18 months after Liza started using the unschooling method. When he moved out in January 2022, he moved back to Washington where he had a job offer.

Liza testified that prior to starting the unschooling method, she discussed it with the children. Upon hearing the discussions, Kenneth inquired about it and expressed his reservations. Liza testified that he agreed to 6-month trial period. During those 6 months, Kenneth raised objections to the unschooling and it became a serious issue between the parties. Liza stated the children wanted to continue using the method and she sided with the children because Kenneth was generally not involved in their schooling.

During the divorce proceedings, Kenneth asked that the children be required to take independent testing to determine where they stood in their peer group with regard to their education. Liza testified that all the children, except Levi, tested either equivalent to or above their respective peer group. Kenneth would not admit at trial that with the exception of Levi, all of the children scored at least consistent with their peer group. He stated, "That's not how I read the test results."

Kenneth testified that before he moved out at the end of January 2022, he explained to the children his reasons for leaving and asked each of them to move with him. He told them Liza had been telling them lies about him, such as that he had an affair and that they had a spiritual father. Kenneth told the children he was moving back to Washington because he had a job offer there. After he moved out, he tried to call the children who stayed with Liza multiple times a week for months and wrote letters but was unable to contact them. He stated that he was unable to speak to the children for close to a year and that Liza was not supportive of him connecting with them.

Liza testified that prior to Kenneth moving out in January 2022, he told the children he could not live with her anymore because she was crazy, was telling them lies about him, and was trying to turn them against him.

Eli, who was 17 years old at the time of trial, stated that prior to unschooling, their home schooling followed a schedule, the time for playing video games was limited, and the family ate dinner together. After they started the unschooling method, there was no learning and the home environment changed. Eli testified that the children's sleep schedules changed in that bedtimes were no longer enforced and the children would stay up late or all night and then sleep late in the morning or into the afternoon. Some of the children stopped showering and brushing their teeth. The normal screen time was between 6 to 8 hours per day. Eli testified that before Kenneth moved out, his parents argued about screen time because Liza wanted it to be unlimited and Kenneth wanted it to be 2 hours per day. There were no restrictions on websites that could be accessed.

Eli also testified that family dinners stopped occurring and, instead, everyone ate whenever he or she was hungry. He stated that there was food in the house that the children could prepare themselves and sometimes Liza would make a large portion of something she wanted for dinner and any of the children could eat it if they wanted or get their own food. The children also were no longer required to do chores as they had in the past and the house was noticeably less clean.

Eli also testified that Kenneth tried to convince all the children to go with him when he moved out, but Eli was the only one who went with him. Eli testified that he wanted to continue living with Kenneth.

Brigham, who was 13 years old at the time of trial, testified that he wakes up each day between 12 p.m. and 2 p.m. and goes to bed around 5 a.m. He eats whenever he is hungry. He does not shower "a whole lot," not as often as "some people would deem healthy." He does use deodorant. When asked about the longest period he had gone without bathing, he responded, "[I]n the multiple month range." Brigham testified there are no rules at Liza's house, as long as you are being "civil." He said there are no rules about internet use, screen time, study time, or hygiene.

Liza's testimony echoed most of the testimony from Eli and Brigham about hygiene and eating habits. Liza testified that she and the children do not bathe "as traditional people do." She testified that she only bathes once a week and she allows the children to decide when they want to bathe. Liza admitted that Cal and one of the other boys had not taken a bath or shower for a year. She did not see any problem with that because they kept themselves clean by spot cleaning. Similarly, Liza testified that the children decide when they need to brush their teeth. None of the children had been to a doctor since 2016 and had not been to a dentist since 2021.

In regard to providing food for the children, Liza testified that she orders groceries online every day from Wal-Mart because it helps her stay within her budget and because there are multiple diet preferences in the family. She testified that every day each child puts what they want on the list and she then reviews it to make sure it fits within their budget and to make sure no one is ordering all "junk food." She will adjust it for healthier options if necessary.

There was much evidence presented about the relationship the children had with each party before and after the parties separated. Liza testified that Kenneth's relationship with the children became strained when the family moved to Nebraska because they wanted more freedom but Kenneth wanted to maintain control of them. Liza also testified that Kenneth would only spend time with the children when there was something he wanted to do. Kenneth was primarily focused on work and his "rest time" after work, which Liza testified often consisted of eating dinner and then playing video games.

Kenneth testified that he participated in activities with the children in the evenings and on weekends. He stated he played basketball with the boys, played family games, read to the children when they were younger, and went to church activities with them. Kenneth was a practicing member of the Church of Latter Day Saints and wanted his children to be raised in that faith, which seemed to be a point of contention with some of the children. Liza was also a member of the church but she had not been active in the church since October 2022.

Brigham testified that there is good communication between him and Liza. He stated she listens to him and is open to his suggestions and ideas. Brigham also testified she is kind and not rude or mean. When Kenneth moved out, he stayed with Liza because he had a better relationship with her and it was more "peaceful" around her than around Kenneth.

As to Brigham's relationship with Kenneth, he testified there were a lot of misunderstandings and miscommunications between the two of them and they disagreed a lot. He does not agree with Kenneth's parenting style, he can be rude, and he tries to press his views on the children, such as his view on religion. Brigham was not sure if he loved his father and stated that he calls him "Ken" because he does not view him as a father figure. Brigham hoped to get to a point where he no longer had to have parenting time with Kenneth or have any contact with him. He further stated, if it was up to him, he would want his mother to have custody and to have no connection with Kenneth.

Kyryi was 18 years old at the time of trial and turned 19 in June 2024. Kyryi testified that she has a good relationship with her mother and feels comfortable talking to her. Liza is supportive of what Kyryi is interested in, her goals, and the choices she makes.

Kyryi described her relationship with Kenneth as "currently non-existent." Like several of her siblings, she calls her father "Ken" instead of "dad" like she did when she was younger. She feels uncomfortable around him because she does not feel like he listens to her or that he is interested in what she has to say. She also feels he is a narcissist. Kyryi testified that before Kenneth moved out of the family home, she was constantly trying to please him, trying to make him happy, and trying to make him believe she was a good person. She also testified that she was happy she was not attending the Church of Latter Day Saints while living with Liza. She indicated she did not want a relationship with her father and wanted to cut him out of her life completely.

Lailah, who was 16 years old when she testified, stated she has a "really good" relationship with Liza. She feels comfortable sharing her feelings with Liza, she listens to her, she is considerate and kind, shows compassion, is not selfish, and wants what is best for Lailah.

Lailah testified that she calls her father "Ken" because she does not consider him to be her father anymore. She stated he is an awful person who has hurt her in a lot of ways. She also said he is narcissistic, manipulative, and always wants to be right.

Lailah also indicated she does not want to be a part of the Church of Latter Day Saints. She stated it was very confining and it empowered Kenneth in being manipulative toward her and her siblings. She further testified that he used the church "to attack us and try to like shame us in who we were and how we were acting." Lailah testified that she no longer had a relationship with Kenneth and did not want to ever see him again.

Levi, 15 years old at the time of trial, testified that his relationship with Liza is "great." He described his relationship with Kenneth as "tense." He further stated that being with his father makes him nervous because he does not know what his father will say or do, or what he will ask Levi to say or do. He testified if given the choice, he would live with Liza and never see Kenneth again.

Both Kyryi and Lailah testified that Kenneth had abused them in the past. Kyryi testified that a couple months after Kenneth moved out, she told her mother that Kenneth had abused her in the past. This was the first time she had ever told anyone about it. She later talked to her therapist about the abuse and had a forensic interview at Project Harmony, where she made statements regarding abuse by Kenneth. The incidents she discussed had occurred some years earlier.

Lailah testified that a few months after Kenneth moved out, she told Liza that Kenneth had sexually abused her in the past. She had not previously told anyone because she did not remember

being abused until after Kenneth moved out. She did not remember details, but she knew one incident occurred when they lived in Luxembourg.

Kenneth testified that he first heard about Kyryi and Lailah's accusations against him in March or April 2022. There was an investigation conducted in Nebraska regarding sexual abuse accusations and other accusations and all were determined to be unfounded.

There was also evidence presented regarding Liza's alleged delusional thinking and hallucinations. Eli testified that Liza told him Kenneth was his physical father, but actor Chris Hemsworth was his spiritual father. Eli also testified that for years Liza had talked about having another daughter someday, whom she would name Phoebe, and Hemsworth would be the father. Brigham testified that Liza told him she believed Hemsworth was the children's father.

Kenneth testified that about a week before he moved out, Liza told the children that Kenneth had an affair based on a dream she had and that Hemsworth was their spiritual father.

Liza admitted at trial that she told the children that Hemsworth was her soulmate and "another spiritual father in [her] life." Liza also told DeLaet that Hemsworth was her soulmate and that this was revealed to her in some sort of spiritual event or dream. She denied telling the children that Kenneth was not their father.

Jurgens, a licensed clinical social worker and licensed mental health practitioner, became involved with the family in December 2023 to try to strengthen the relationship between Kenneth and the children. She had met with every family member, except Lailah, but had mainly worked with Kenneth and the four boys.

Jurgens testified that Eli is socialized, but the other boys are not. There has not been much opportunity for socialization for them because they are not involved in social activities and have little interaction with other children. She further testified that Kyryi has had no socialization, outside of her caring for her pet rabbits.

Jurgens testified that Levi, Brigham, and Cal did not like Kenneth planning activities, such as going to a restaurant, going to a park, or going on a hike. They also did not like Kenneth trying to structure their day or limiting their screen time. They have expressed to Kenneth that they do not want to attend the services at the Church of Latter Day Saints. Jurgens noted that Levi, Brigham, and Cal call their father "Ken" instead of "dad" or "father." She also testified that neither Levi, Brigham, nor Cal had told her anything specific that would explain why they were so oppositional to Kenneth.

Levi, Brigham, and Cal made it clear to Jurgens that they are very fond of Liza and feel more comfortable with her than with Kenneth. When asked what they liked about Liza, the three boys indicated that they liked the unschooling method because Liza allowed them to "do the things they liked to do" and it was "laid back." Based on Jurgens' understanding, Liza did not impose bedtimes; basic hygiene was left to the children's discretion; and there was no internet restriction.

DeLaet, who performed the custody evaluation, testified that the unschooling concept had carried over into other areas of the children's lives. For example, Liza left it up to the children to decide their bathing habits. He testified that some of the children had self-diagnosed mental health problems, but none had been professionally diagnosed with any problems. Both Kyryi and Lailah told him they had been sexually abused by Kenneth when they were younger.

DeLaet testified that he visited the homes of both parties. At Liza's home, she pointed out several items that were broken but said she did not have money to fix them. DeLaet observed a

rabbit pen in the dining room, which he described as cardboard on the floor with a metal fence around the area, "cardboard housings and activities," and vegetables and water. There was also a smaller pen area in Lailah's bedroom and noticeable stains on the carpet. He also stated there was a strong body odor in Cal's bedroom. He had learned during his evaluation that there were no bathing or hygiene rules at Liza's house, and few rules overall. During his visit he did not observe much interaction between Liza and the children.

DeLaet visited Kenneth's home in Omaha during a time that Kenneth had parenting time with Levi, Brigham, and Cal. Kenneth's girlfriend and her son were also present. They all had a family dinner together and played games after dinner.

DeLaet recommended Kenneth be awarded legal and physical custody of the children. He believed Liza's relationship with the children was "enmeshed," meaning the children were tangled up in her issues and were very strong advocates for her. He also testified that all the children except Eli were alienated from their father, which he explained meant they had unreasonable negative feelings and beliefs toward him that were significantly disproportionate to the children's actual experience with him. DeLaet also testified that Liza had engaged in either accidental or purposeful "programming" or "indoctrinating" of the children to her points of view.

*District Court's Findings.*

Following trial, the court entered a decree of dissolution of marriage. Kenneth was awarded sole physical custody of Eli, and Liza was awarded sole physical custody of Lailah, Levi, Brigham, and Cal. Kyryi had reached the age of majority during the pendency of the case so no custody determination was made on her behalf.

Each party was awarded sole legal custody of each child in their possession; except on the issue of education, the parties were awarded joint legal custody of all five minor children. Specifically, the parties were to agree on either home schooling by Liza or public/private school attendance. If the parties could not agree, Kenneth was given final decision-making authority as to home schooling by Liza or public/private school attendance. If home schooling was chosen, home schooling and its curriculum had to follow the law in the State of Nebraska.

Kenneth was awarded parenting time with Levi, Brigham and Cal, but was not awarded any parenting time with Lailah. Lailah was to attend therapy within 45 days of the date of the decree at Liza's expense. Kenneth was not to have parenting time with Lailah unless her therapist recommended that it occur. When and if Lailah's therapist recommended that Lailah have parenting time with Kenneth, the parenting time was to be supervised, and subject to the terms specifically provided by the therapist, unless and until the therapist recommended unsupervised parenting time. At that time, Lailah's parenting time with Kenneth would be the same as the other minor children.

Liza was awarded parenting time with Eli, on a regular basis, but the schedule was to be agreed upon by Liza and Eli.

The district court divided the marital estate and Kenneth was ordered to pay an equalization amount of $115,138.82. The court ordered that Kenneth and Liza would be solely responsible for any amount they owed in taxes, penalties, and interest for tax year 2023, and each would retain any refunds from their filings for tax year 2023 free and clear of any interest of the other.

The district court awarded Liza $3,000 per month in alimony for 60 months. It also ordered Kenneth to pay $30,000 in attorney fees to Liza within 60 days of the decree.

Liza filed a motion to alter or amend and/or motion for new trial. The court entered an order sustaining the motion to alter or amend in part, including a modification to the equalization payment, which changed from $115,138.82 to $114,021.82. The court denied the motion for new trial.

## ASSIGNMENTS OF ERROR

Kenneth assigns that the district court erred in (1) awarding Liza physical and legal custody of Lailah, Levi, Brigham, and Cal, because there was "overwhelming evidence that Liza had neglected the children's educational, socialization, hygiene, and nutritional needs, while also depriving the children of medical, dental and psychological care;" (2) awarding Liza physical and legal custody of Lailah, Levi, Brigham, and Cal, because there was "overwhelming evidence that Liza [was] unfit due to suffering from delusional thinking and hallucinations, while enacting a pattern of alienating behaviors throughout the case;" (3) awarding parenting time between him and Lailah at the discretion of Lailah's therapist; (4) failing to include 2023 tax return debts and proceeds when valuing the marital estate; (5) determining the amount and duration of alimony; and (6) awarding attorney fees to Liza.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Seemann v. Seemann*, 318 Neb. 643, 18 N.W.3d 118 (2025). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*. To be "untenable" is to be "incapable of being defended." *State v. Jeremiah T.*, 319 Neb. 133, 152, 21 N.W.3d 313, 327 (2025).

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Seemann v. Seemann, supra.*

## ANALYSIS

*Legal and Physical Custody of Lailah, Levi, Brigham, and Cal.*

Kenneth's first two assignments of error allege that the district court erred in awarding Liza legal and physical custody of Lailah, Levi, Brigham, and Cal. The paramount consideration in determining child custody is the best interests of the children. *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025). Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in regard to custody. *Scott v. Scott, supra.* Such factors include the relationship of the minor child to each parent; the desires and wishes of the minor child; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse. *Id.*

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may also consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Scott v. Scott, supra.*

Although Kenneth lists multiple reasons in his two assignments of error as to why Liza should not be awarded custody, he only specifically argues a few of them. Kenneth first argues that Liza had neglected the children's education by using the unschooling method to home school the children. However, the court awarded the parties joint legal custody on the issue of education and gave Kenneth final decision-making authority as to home schooling or public/private school attendance. Therefore, the court essentially resolved Kenneth's concern regarding the children's education.

Kenneth next argues Liza should not have custody because of her parenting approach to personal hygiene, as well as the unkept condition of her home. Regarding hygiene, there was evidence that the children do not bathe in the traditional sense that most people do. The children do not shower or take baths on a regular basis, but, rather, they spot clean themselves and only bathe when they are dirty or have body odor. Similarly, the children do not brush their teeth on a daily basis, but, rather, only when they feel their teeth are dirty.

Regarding the condition of Liza's home, DeLaet noted from his home visit that Liza's dining room had essentially been converted into a rabbit pen, Lailah's room also had a rabbit pen and stained carpet, and Cal's room smelled of body odor. Liza also pointed out various home repairs that needed to be made, but she could not afford them. DeLaet also observed that Liza and the children did not interact as a family during his visit.

As the district court found, Liza has an "unconventional approach" to parenting, but that the children were "intelligent, mannerly and personable." We agree that a "non-traditional" parent does not necessarily equate to an unfit parent. There was no evidence that Liza's approach to parenting, specifically hygiene, or the condition of the home, was harmful or dangerous to the children.

Kenneth also argues that Liza's delusional thinking and hallucinations make her unfit to have custody. There was evidence that Liza believed Hemsworth was her "soulmate" or "spiritual father" and she had spoken to the children about this belief. Although believing in soulmates and spiritual connections might be unusual, it does not mean Liza is delusional or suffering from hallucinations as Kenneth claims. There was no evidence presented that Liza's spiritual beliefs damaged or negatively impacted the children or negatively impacted Liza's ability to parent. Kenneth argues there was evidence that the children have mental health issues, but none of the children have been diagnosed by a professional with any mental health concerns.

We further find that the relationship of the children with each parent, as well as the children's preferences, weigh heavily in this case. Liza has been the children's primary caregiver throughout their lives, as well as their educator. The evidence was clear that Lailah, Levi, and Brigham had a good relationship and strong bond with Liza. Lailah testified that she felt comfortable talking to Liza and sharing her feelings with her. Levi testified that he had a great

relationship with Liza. Brigham testified he and his mother have a good relationship and communicate well.

The evidence showed that Kenneth did not have a good relationship with Lailah, Levi, and Brigham even before the dissolution of marriage proceedings began. Lailah testified that Kenneth is manipulative and emotionally toxic. She also testified that he had sexually abused her and that she never wanted to see him again. Levi testified that Kenneth makes him tense and nervous and if he had a choice, he would never see him again. Brigham testified that he does not view Kenneth as a father figure and hoped one day he would never have contact with him again.

When Kenneth moved out, he asked the children to come with him. He testified that he believed it was better to let the children decide which parent they wanted to live with, rather than to try to force them to move with him. Only Eli chose to move with him. The other five minor children at the time stayed with Liza. Lailah, Levi, and Brigham also testified that it was their preference to live with Liza. Based on their testimony, their desires and wishes were of sound reasoning and should be considered. Cal did not testify as he was only around 10 years old at time of trial.

The district court heard all the evidence and observed the witnesses, including the children who testified. Under our standard of review previously noted, where evidence is in dispute, we may give weight to the fact that the fact finder heard and observed the witnesses and accepted one version of the facts rather than another. See *Seemann v. Seemann*, 318 Neb. 643, 18 N.W.3d 118 (2025). Here, we give such weight to the district court's determination and conclude that it did not abuse its discretion in awarding Liza primary legal and physical custody of Lailah, Levi, Brigham, and Cal.

*Kenneth's Parenting Time With Lailah.*

Kenneth assigns the district court erred in awarding parenting time with Lailah at the discretion of an unnamed therapist and "create[ing] a void, contingent, order delegating the amount of time and the manner of [his] visitation." Brief for appellant at 38.

The court ordered that Kenneth was not to have parenting time with Lailah unless her therapist recommended it. When and if Lailah's therapist recommended parenting time, it was to be supervised, and subject to the terms specified by the therapist, unless and until the therapist recommends unsupervised parenting time. At that time, Lailah's parenting time with Kenneth would be the same as the other minor children.

The authority to determine custody and visitation cannot be delegated, because it is a judicial function. *Sulzle v. Sulzle*, 318 Neb. 194, 14 N.W.3d 532 (2024). Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination. *Sulzle v. Sulzle, supra.* The rule that custody and visitation of minor children are to be determined on the basis of their best interests clearly envisions an independent inquiry by the court. *Id.* Delegation of the court's duty to determine custody and visitation could result in the denial of proper visitation rights of the noncustodial parent. *Id.* There is a strong presumption in favor of visitation, and the right of access to one's children should not be denied unless the court is convinced such visitations are detrimental to the best interests of the child. *Id.*

Kenneth argues that the court improperly delegated its authority to determine his parenting time with Lailah. He suggests that the court unlawfully delegated a judicial function to an unnamed

therapist for an unknown duration. We disagree. The district court did not delegate decisions to Lailah's therapist, but, rather, indicated it would not consider parenting time between Kenneth and Lailah until it was recommended by Lailah's therapist. In other words, the district court suspended Ken's parenting time with Lailah until her therapist recommends visits with Ken should occur. The court retained the authority to make decisions regarding future parenting time. See *Vanskiver v. Vanskiver*, 303 Neb. 664, 930 N.W.2d 569 (2019) (suspension of parenting time is not delegation, and suspension by district court may be appropriate).

Kenneth also argues that the unfounded allegations of sexual abuse should not be held against him, which he claims the court was doing by denying him parenting time with Lailah. We determine the court was not holding the allegations against him but, rather, was taking the evidence of abuse into consideration when determining what was in Lailah's best interests. The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *State on behalf of Paul O. & Nickolas O. v. Samuel O.*, 33 Neb. App. 820, ___ N.W.3d ___ (2025). Lailah testified that she told Liza a few months after Kenneth moved out that he had abused her. Lailah stated she started remembering the abuse after Kenneth left the home. She was scared of him and did not want to ever see him again. Lailah also told DeLaet about the abuse. DeLaet's report states that even after no charges were brought against Kenneth, Lailah "remained steadfast in her belief that she is a trauma victim with her father being the perpetrator."

The district court stated that it took into account the allegations of abuse made by Kyryi and Lailah against Kenneth and approved a parenting plan that addressed the issue of abuse as it pertained to Lailah as required by law. We conclude that the district court took Lailah's best interests into account when making a decision about her parenting time with Kenneth.

*Division of Marital Estate.*

Kenneth's next assignment of error concerns the division of the marital estate. Specifically, he claims the court erred in failing to include 2023 tax return proceeds and debts in the marital estate.

For tax year 2023, the parties filed "married filing separately," with each party claiming three minor children. The court ordered that each party would be solely responsible for any amount he or she owed in taxes, penalties, and interest, and each party would retain any refunds from his or her filing for tax year 2023 free and clear of any interest of the other. Kenneth's 2023 tax debt obligation was $7,752 and Liza received a tax refund of $10,365.

Neb. Rev. Stat. § 42-365 (Reissue 2016) provides for the division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, and a history of the contributions to the marriage by each party, and, further, § 42-365 provides that the purpose of a property division is to distribute the marital assets equitably between the parties. *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025).

There is no mathematical formula by which property awards can be precisely determined, but, generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

Generally, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate and the property being divided. The date of valuation is reviewed for an abuse of the trial court's discretion. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996

- 11 -

N.W.2d 592 (2023). The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided. *Karas v. Karas*, 314 Neb. 857, 993 N.W.2d 473 (2023).

Kenneth claims that because the court included 2016 Luxembourg tax debt in the marital estate, giving Kenneth credit for the debt, which was paid after separation, it should also have included Kenneth's 2023 tax debt and Liza's 2023 tax refund. The addition of the 2023 tax refunds onto the equalization worksheet would cause Liza's asset distribution to increase by $10,000, and an additional debt of $7,752 would be added to Kenneth's debts. This would decrease Kenneth's net assets to $374,153.49 and increase Liza's net assets to $161,627.85, resulting in a $8,876 reduction in Kenneth's equalization payment.

The district court used March 25, 2022, the date the dissolution complaint was filed, as the valuation date for purposes of the property division of the marital estate. This date was rationally related to the property composing the marital estate and the property being divided. See *Radmanesh v. Radmanesh, supra.* The Luxembourg tax debt was incurred in 2016, well before the complaint for dissolution was filed and at a time when all the finances were being shared by the parties. In 2023, the parties were in the middle of dissolution proceedings, had been living separately since January 2022, and all their finances were separate.

We conclude the district court equitably divided the marital estate and it did not err in failing to include Kenneth's 2023 tax return debt and Liza's 2023 tax return proceeds in the marital estate. This assignment of error fails.

*Alimony.*

Kenneth next assigns that the district court erred in awarding Liza alimony in the amount of $3,000 per month for 60 months.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.*

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Wiedel v. Wiedel, supra*. The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

We first note that this was a long-term marriage. The parties were married for over 17 years at the time of separation and had six children during the marriage. Further, the evidence showed that Kenneth worked throughout the marriage and was the sole income earner, while Liza took

care of the home and raised the children. She was out of the workforce throughout the marriage. In addition to taking care of the family's daily needs, Liza also home schooled the children. The parties had agreed to this arrangement early on in their marriage.

Kenneth also obtained three college degrees during the marriage. Liza earned an associate's degree early in the marriage but had no further education since then except for earning some type of certificate in nutrition. She had been out of the workforce prior to obtaining a job at Wal-Mart in March 2023 as a pharmacy technician. At the time of trial, she was working 30 hours per week and earning $19.50 per hour, or approximately $2,750 per month. Kenneth earned $25,000 per month. Even after Liza became employed, Kenneth was earning substantially more income than Liza. Liza expressed a desire to go back to school to obtain a bachelor's degree. Kenneth acknowledged that some amount of alimony was warranted to allow Liza to get additional schooling so she could become self-sustaining and support herself.

The district court awarded Liza $3,000 per month for 60 months. Based on the evidence in the record before us, we cannot say that the district court abused its discretion in determining the duration and amount of alimony awarded to Liza.

*Attorney Fees.*

Finally, Kenneth assigns the district court erred in awarding Liza $30,000 in attorney fees. He claims that a large amount of her fees were caused by her non-compliance with court orders throughout the divorce.

Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025). A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id.* In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

Liza presented evidence that her attorney fees were in excess of $49,000. Kenneth argues that the district court's award of attorney fees should be reduced or eliminated because Liza had a "clear track record of bad faith non compliance [sic] [with court orders]." Brief for appellant at 44. To the contrary, Liza contends that Kenneth filed excessive motions, subpoenas, and supplemental discovery responses.

Kenneth was earning over $300,000 per year, while Liza was making around $30,000 per year--a significant discrepancy. Kenneth had paid his attorney over $50,000 in fees at the time of trial. Liza's attorney had only been paid $500 that Kenneth paid based on a temporary order. We cannot say that the district court abused its discretion by awarding Liza $30,000 in attorney fees.

CONCLUSION

For the reasons set forth above, we conclude that Kenneth's assignments of error regarding custody and parenting time, the division of the marital estate, and the award of alimony and attorney fees to Liza all fail. As such, we affirm the order of the district court in its entirety.

AFFIRMED.

- 13 -